**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 4, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

MATTHEW JACK DWIGHT VOGT,

    Plaintiff - Appellant,

v.

CITY OF HAYS, KANSAS; CITY
OF HAYSVILLE, KANSAS; DON
SCHEIBLER; JEFF WHITFIELD;
KEVIN SEXTON; BRANDON
WRIGHT,

    Defendants - Appellees.

No. 15-3266

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:15-CV-01150-JTM-GEB)**
_____

Morgan L. Roach, McCauley & Roach, LLC, Kansas City, Missouri,
for Plaintiff-Appellant.

David R. Cooper, Fisher, Patterson, Sayler & Smith, L.L.P., Topeka,
Kansas, David G. Seely, Fleeson, Gooing, Coulson & Kitch, L.L.C.,
Wichita, and Jeremy K. Schrag, Lewis Brisbois Bisgaard & Smith
LLP, Wichita, Kansas (Alan L. Rupe, and Jessica L. Skladzien, Lewis
Brisbois Bisgaard & Smith, LLP, Wichita, Kansas, with them on the
brief), for Defendants-Appellees.
_____

Before **HARTZ**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

Mr. Matthew Vogt alleges a violation of the Fifth Amendment through the compulsion to incriminate himself and the use of his compelled statements in a criminal case. Based on the alleged Fifth Amendment violation, Mr. Vogt invokes 42 U.S.C. § 1983, suing (1) the City of Hays, Kansas; (2) the City of Haysville, Kansas; and (3) four police officers. The district court dismissed the complaint for failure to state a claim, reasoning that

- the right against self-incrimination is only a trial right and

- Mr. Vogt's statements were used in pretrial proceedings, but not in a trial.

We draw four conclusions:

1. The Fifth Amendment is violated when criminal defendants are compelled to incriminate themselves and the incriminating statement is used in a probable cause hearing.

2. The individual officers are entitled to qualified immunity.

3. The City of Haysville did not compel Mr. Vogt to incriminate himself.

4. Mr. Vogt has stated a plausible claim for relief against the City of Hays.

Accordingly, we (1) affirm the dismissal of the claims against the four police officers and Haysville and (2) reverse the dismissal of the claim against the City of Hays.

2

**I. Mr. Vogt alleges that his compelled statements were used in a criminal case.**

Because this appeal is based on a dismissal for failure to state a valid claim, we credit the factual allegations in the complaint. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

Mr. Vogt was employed as a police officer with the City of Hays. In late 2013, Mr. Vogt applied for a position with the City of Haysville's police department. During Haysville's hiring process, Mr. Vogt disclosed that he had kept a knife obtained in the course of his work as a Hays police officer.

Notwithstanding this disclosure, Haysville offered the job to Mr. Vogt. But his disclosure about the knife led Haysville to make the offer conditional: Mr. Vogt could obtain the job only if he reported his acquisition of the knife and returned it to the Hays police department. Two Haysville police officers said that they would follow up with Hays to ensure that Mr. Vogt complied with the condition.

Mr. Vogt satisfied the condition, reporting to the Hays police department that he had kept the knife. The Hays police chief reacted by ordering Mr. Vogt to submit a written report concerning his possession of the knife. Mr. Vogt complied, submitting a vague one-

sentence report. He then provided Hays with a two-week notice of resignation, intending to accept the new job with Haysville.

In the meantime, the Hays police chief began an internal investigation into Mr. Vogt's possession of the knife. In addition, a Hays police officer required Mr. Vogt to give a more detailed statement in order to keep his job with the Hays police department. Mr. Vogt complied, and the Hays police used the additional statement to locate additional evidence.

Based on Mr. Vogt's statements and the additional evidence, the Hays police chief asked the Kansas Bureau of Investigation to start a criminal investigation. In light of this request, the Hays police department supplied Mr. Vogt's statements and additional evidence to the Kansas Bureau of Investigation. The criminal investigation led the Haysville police department to withdraw its job offer.

Mr. Vogt was ultimately charged in Kansas state court with two felony counts related to his possession of the knife. Following a probable cause hearing, the state district court determined that probable cause was lacking and dismissed the charges.

This suit followed, with Mr. Vogt alleging use of his statements (1) to start an investigation leading to the discovery of additional evidence concerning the knife, (2) to initiate a criminal investigation, (3) to bring criminal charges, and (4) to support the

4

prosecution during the probable cause hearing. Mr. Vogt argues that these uses of his compelled statements violated his right against self-incrimination.

## II.  Standard of Review

We engage in *de novo* review of the district court's dismissal. *Mocek v. City of Albuquerque*, 813 F.3d 912, 921 (10th Cir. 2015). To survive the motion to dismiss, Mr. Vogt had to plead enough facts to create a facially plausible claim. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012). The claim is facially plausible if Mr. Vogt pleaded enough factual content to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.  The Meaning of a "Criminal Case" Under the Fifth Amendment

The Fifth Amendment[1] protects individuals against compulsion to incriminate themselves "in any criminal case." U.S. Const. amend. V. This amendment prohibits compulsion of law enforcement officers to make self-incriminating statements in the course of employment. *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). As a law enforcement officer, Mr. Vogt enjoyed protection under the Fifth

---

[1]  The Fifth Amendment applies to the states through incorporation of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

5

Amendment against use of his compelled statements in a criminal case.

The district court held that Mr. Vogt had not stated a valid claim under the Fifth Amendment because the incriminating statements were never used at trial. We disagree, concluding that the phrase "criminal case" includes probable cause hearings.

**A.     Our precedents provide conflicting signals on whether the term "criminal case" includes pretrial proceedings as well as the trial.**

The U.S. Supreme Court has not conclusively defined the scope of a "criminal case" under the Fifth Amendment. In dicta, the Supreme Court suggested in a 1990 opinion, *United States v. Verdugo-Urquidez*, that the right against self-incrimination is only a trial right. 494 U.S. 259, 264 (1990).

But the Supreme Court later appeared to retreat from that dicta. In *Mitchell v. United States*, for instance, the Court held that the right against self-incrimination extends to sentencing hearings. 526 U.S. 314, 320-21, 327 (1999). The Court reasoned that "[t]o maintain that sentencing proceedings are not part of 'any criminal case' is contrary to the law and to common sense." *Id.* at 327.

Even more recently, the Court again addressed the scope of the Fifth Amendment in *Chavez v. Martinez*, 538 U.S. 760 (2003). In *Chavez*, the plaintiff sued a police officer under § 1983, alleging

6

coercion of self-incriminating statements in violation of the Fifth Amendment. 538 U.S. at 764-65. Writing for himself and two other justices, Justice Thomas concluded that (1) the plaintiff had failed to state a valid claim because he had not been charged with a crime and (2) the plaintiff's statements had not been used in a criminal case. *Id.* at 766.

Though the Court did not produce a majority opinion on the Fifth Amendment issue, Justice Thomas's plurality opinion explained that "mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness." *Id.* at 769. Justice Thomas added that "[a] 'criminal case' at the very least requires the initiation of legal proceedings." *Id.* at 766. Two other justices agreed with the outcome, reasoning that the Fifth Amendment's text "focuses on *courtroom use* of a criminal defendant's compelled, self-incriminating testimony." *Id.* at 777 (Souter, J., concurring in the judgment) (emphasis added).

The *Chavez* Court did not decide "the precise moment when a 'criminal case' commences." *Id.* at 766-67. Justice Thomas cited *Verdugo-Urquidez*, but apparently did not read it to limit the Fifth Amendment to use at trial. *See id.* at 767.

7

Three other justices stated that a violation of the Self-Incrimination Clause is complete the moment a confession is compelled. *Id.* at 795 (Kennedy, J., concurring in part and dissenting in part). Thus, even in light of *Verdugo-Urquidez*, these three justices concluded that the Fifth Amendment extended beyond use of a compelled statement at trial. *Id.* at 792.

Following *Chavez*, a circuit split developed over the definition of a "criminal case" under the Fifth Amendment. The Third, Fourth, and Fifth Circuits have stated that the Fifth Amendment is only a trial right.[2] *See Renda v. King*, 347 F.3d 550, 552 (3d Cir. 2003) ("[A] plaintiff may not base a § 1983 claim on the mere fact that the police questioned her in custody without providing *Miranda* warnings when there is no claim that the plaintiff's answers were used against her at trial."); *Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005) ("[The plaintiff] does not allege any *trial* action that violated his Fifth Amendment rights; thus, *ipso facto*, his claim fails on the [*Chavez*] plurality's reasoning."); *Murray v. Earle*, 405 F.3d 278,

---

[2] The defendants contend that the Sixth Circuit Court of Appeals has also held that the Fifth Amendment is only a trial right. Appellees' Br. at 20-21. But the court did so only in an unpublished opinion. *Smith v. Patterson*, 430 F. App'x 438, 441 (6th Cir. 2011). The court's unpublished opinions do not constitute binding precedent even in the Sixth Circuit. *Graiser v. Visionworks of America, Inc.*, 819 F.3d 277, 283 (6th Cir. 2016).

8

285 (5th Cir. 2005) ("The Fifth Amendment privilege against self-incrimination is a fundamental trial right which can be violated only *at* trial, even though pre-trial conduct by law enforcement officials may ultimately impair that right.").

In contrast, the Second, Seventh, and Ninth Circuits have held that certain pretrial uses of compelled statements violate the Fifth Amendment. For example, the Second Circuit has applied *Chavez* to hold that a bail hearing is part of a criminal case under the Fifth Amendment. *Higazy v. Templeton*, 505 F.3d 161, 171, 173 (2d Cir. 2007). The Seventh Circuit has similarly held that a criminal case under the Fifth Amendment includes not only bail hearings but also suppression hearings, arraignments, and probable cause hearings. *Best v. City of Portland*, 554 F.3d 698, 702-03 (7th Cir. 2009) (suppression hearing); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1027 (7th Cir. 2006) (bail hearings, arraignments, and probable cause hearings). And the Ninth Circuit has concluded that a Fifth Amendment violation occurs when "[a] coerced statement . . . has been relied upon to file formal charges against the declarant, to determine judicially that the prosecution may proceed, and to determine pretrial custody status." *See Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009).

9

Different approaches have emerged because the *Chavez* Court declined to pinpoint when a "criminal case" begins. *See Koch v. City of Del City*, 660 F.3d 1228, 1245 (10th Cir. 2011) (noting that "the plurality in *Chavez* explicitly declined to decide 'the precise moment when a "criminal case" commences'"). Like the Supreme Court, we have not yet defined the starting point for a "criminal case." *See id.* at 1246 (avoiding this issue by holding that at the time of the plaintiff's arrest, "it was not clearly established that an individual has a Fifth Amendment right to refuse to answer an officer's questions during a *Terry* stop"); *Eidson v. Owens*, 515 F.3d 1139, 1149 (10th Cir. 2008) (declining to define the scope of the right against self-incrimination because the plaintiff "never incriminated herself during a custodial interrogation").

The defendants argue that we have consistently held that the Fifth Amendment right is only a trial right. We disagree.

In support of their argument, the defendants cite our opinions in *Bennett v. Passic*, 545 F.2d 1260 (10th Cir. 1976), and *Pearson v. Weischedel*, 349 F. App'x 343 (10th Cir. 2009) (unpublished). These opinions do not help in answering our question. In *Bennett*, we held that civil liability may not arise from (1) failure to give *Miranda* warnings or (2) testimony about compelled statements. 545 F.2d at 1263-64. These scenarios are not involved here. And in our

10

unpublished opinion in *Pearson*, we rejected a Fifth Amendment claim, stating that the plaintiff had pleaded guilty and had never gone to trial. *Pearson*, 349 F. App'x at 348. Our analysis was brief and omitted discussion of *Chavez*. Thus, *Pearson* does not aid our inquiry.

In addition, the defendants read *In re Grand Jury Subpoenas Dated Dec. 7 & 8 (Stover)*, 40 F.3d 1096 (10th Cir. 1994), to suggest that a violation of the right against self-incrimination occurs only at trial. This suggestion is based on a questionable interpretation of the opinion. In *Stover*, the parties agreed that a Fifth Amendment violation occurs when a grand jury returns an indictment based on a compelled statement. 40 F.3d at 1100-01. Notwithstanding the parties' agreement on this issue, we quoted language from an earlier opinion describing the Fifth Amendment as a trial right. *See id.* at 1103 ("The time for protection [of the right against self-incrimination] will come when, if ever, the government attempts to use [allegedly incriminating] information against the defendant at trial." (quoting *United States v. Peister*, 631 F.2d 658, 662 (10th Cir. 1980))).

Though we quoted this restrictive language, we also suggested in dicta that the parties had correctly assumed that the Fifth Amendment is triggered when a compelled statement is used during

11

grand jury proceedings. *See id.* at 1103 ("If an officer, whose compelled statement has been considered by the grand jury, ultimately is indicted, that officer will be able to challenge the indictment and the government will be required to prove that its evidence derives entirely from legitimate sources or that the grand jury's exposure to the officer's statement was harmless."). Thus, *Stover* arguably suggests that the right against self-incrimination is not simply a trial right.

* * *

These precedents supply conflicting signals on whether the term "criminal case" extends beyond the trial itself. The dicta in *Verdugo-Urquidez* suggests that the term "criminal case" refers only to the trial. This dicta would ordinarily guide us, for Supreme Court dicta is almost as influential as a Supreme Court holding. *Indep. Inst. v. Williams*, 812 F.3d 787, 798 n.13 (10th Cir. 2016). But after deciding *Verdugo-Urquidez*, the Supreme Court interpreted the term "criminal case" in *Mitchell* to include sentencing proceedings. And even later, the Supreme Court declined in *Chavez* to define when a "criminal case" begins.

Like the Supreme Court, we have declined until now to unequivocally state whether the term "criminal case" covers pretrial proceedings as well as the trial. Precedents like *Stover* provide

12

conflicting signals without squarely deciding the issue. Nonetheless, today's case requires us to decide whether the term "criminal case" covers at least one pretrial proceeding: a hearing to determine probable cause.

**B.     The right against self-incrimination applies to use in a probable cause hearing as well as at trial.**

To decide this issue, we join the Second, Seventh, and Ninth Circuits, concluding that the right against self-incrimination is more than a trial right. In reaching this conclusion, we rely on

- the text of the Fifth Amendment, which we interpret in light of the common understanding of the phrase "criminal case," and

- the Framers' understanding of the right against self-incrimination.

The Fifth Amendment provides that no person shall be "compelled in any *criminal case* to be a witness against himself." U.S. Const. amend. V (emphasis added). The text of the Fifth Amendment does not contain

- the term "trial," which appears in the next two amendments, or

- the term "criminal prosecution," which is used in the next amendment.

*See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."); *id.* amend.

13

VII ("In suits at common law . . . the right of trial by jury shall be preserved . . . .").

The Supreme Court discussed the distinction between the language of the Fifth and Sixth Amendments in *Counselman v. Hitchcock*, 142 U.S. 547 (1892), *overruled in part on other grounds by Kastigar v. United States*, 406 U.S. 441 (1972). In *Counselman*, the government argued that a witness could not invoke the Fifth Amendment in a grand jury proceeding because a "criminal case" did not exist. 142 U.S. at 562-63. The Supreme Court rejected this argument. After analyzing the Fifth Amendment's text and underlying purpose, the Court held that the witness could plead the Fifth Amendment during a grand jury proceeding. *Id.* In the course of its analysis, the Court reasoned that the language "criminal case" is broader than the Sixth Amendment's phrase "criminal prosecution." *Id.*

We agree with the *Counselman* Court that the term "criminal case" is broader than the term "criminal prosecution." Indeed, on its face, the term "criminal case" appears to encompass all of the proceedings involved in a "criminal prosecution."

"The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning . . . ." *United States v.*

14

*Sprague*, 282 U.S. 716, 731 (1931). To determine the commonly understood meaning of the phrase "criminal case" at the time of ratification (1791), we examine dictionary definitions from the Founding era. *See* Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 Geo. Wash. L. Rev. 358, 365 (2014); *see also* William M. Carter, Jr., *Race, Rights, and the Thirteenth Amendment: Defining the Badges and Incidents of Slavery*, 40 U.C. Davis L. Rev. 1311, 1338 n.99 (2007) (stating that contemporaneous dictionaries "obviously . . . provide some guidance to the commonly understood meaning of a particular word at the time that word was used in the constitutional text").

The most authoritative dictionary of that era was Noah Webster's 1828 dictionary, *An American Dictionary of the English Language. See* John A. Sterling, *Above the Law: Evolution of Executive Orders (Part One)*, 31 UWLA L. Rev. 99, 107 (2000) (stating that most historians use Noah Webster's 1828 dictionary when trying to determine the meaning of words during adoption of the Constitution); *see also* Charles Wood, *Losing Control of America's Future—The Census, Birthright Citizenship, and Illegal Aliens*, 22 Harv. J.L. & Pub. Pol'y 465, 478 (1999) (stating that Noah Webster's 1828 dictionary was "the first and for many years the

authoritative American dictionary"); Steven G. Calabresi & Andrea Matthews, *Originalism and* Loving v. Virginia, 2012 B.Y.U. L. Rev. 1393, 1425 (2012) (describing Noah Webster's 1828 dictionary as "an incredible achievement" and as a "dominant" source since its publication); Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the* Constitution, 82 Geo. Wash. L. Rev. 358, 389-90 (2014) (stating that the Supreme Court often cites Noah Webster's 1828 dictionary as evidence of the original meaning of the Constitution, perhaps based on a belief "that the dictionary may reflect better the ways in which Americans used and understood the words in the Constitution"). Webster's 1828 dictionary defines "case" as "[a] cause or suit in court," stating that the term "is nearly synonymous with *cause*." Noah Webster, *Case*, *An American Dictionary of the English Language* (1st ed. 1828). And the dictionary defines the "nearly synonymous" term "cause" as "[a] suit or action in court." *Id.*, *Cause.* Similarly, N. Bailey's 1789 dictionary broadly defines "case" as a "thing, matter, question." N. Bailey, *The Universal Etymological English Dictionary*, *Case* (26th ed. 1789).[3]

---

[3] The Founders recognized that a word's meaning often changes over time. *See* Caleb Nelson, *Originalism and Interpretive Conventions*, 70 U. Chi. L. Rev. 519, 534 (2003) ("Americans of the

16

The Founders' understanding of the term "case" suggests that the Fifth Amendment encompasses more than the trial itself. *See* Donald Dripps, *Akhil Amar on Criminal Procedure and Constitutional Law: "Here I Go Down that Wrong Road Again*," 74 N.C. L. Rev. 1559, 1627 (1996).[4] "If the Framers had meant to

---

founding generation tended to agree with [Samuel Johnson, the 18th century's leading lexicographer] that language change was inevitable."). But modern legal dictionaries define "case" much as our Founders did. *See Black's Law Dict.* 258 (Bryan A. Garner ed., 10th ed. 2014) (defining "case" as "[a] civil or criminal proceeding, action, suit, or controversy at law or in equity"); *A Handbook of Criminal Law Terms* 84 (Bryan A. Garner ed., 2000) (defining "case" as "[a] proceeding, action, suit, or controversy at law or in equity"); *Dict. of Legal Terms* 70 (Steven H. Gifis, 4th ed. 2008) (defining "case" as "an action, cause, suit, or controversy, at law or in equity"); *see also* Martin H. Redish & Adrianna D. Kastanek, *Settlement Class Actions, the Case-or-Controversy Requirement, and the Nature of the Adjudicatory Process*, 73 U. Chi. L. Rev. 545, 565 (2006) ("[C]urrent-day legal dictionaries define 'case' as a justiciable 'action or suit,' or an 'argument.'" (footnotes omitted)).

[4]    Professor Dripps stated:

> A "case" in any event is not necessarily identical to a "prosecution." The Sixth Amendment uses the latter term, in dealing with the criminal trial. The Fifth Amendment, by contrast, contains a miscellany of rights, some against criminal and some against civil liabilities. We speak routinely of police investigators working on a case before they have a suspect. If we think of a "case" as a potential "prosecution" we can square the text of the Fifth Amendment with its history.

Donald Dripps, *Akhil Amar on Criminal Procedure and Constitutional Law: "Here I Go Down that Wrong Road Again*," 74 N.C. L. Rev. 1559, 1627 (1996) (footnotes omitted).

17

restrict the right to 'trial,' they could have said so." Thomas Y. Davies, *Farther and Farther from the Original Fifth Amendment: The Recharacterization of the Right Against Self-Incrimination as a "Trial Right" in* Chavez v. Martinez, 70 Tenn. L. Rev. 987, 1014 (2003).

This interpretation is supported by the Supreme Court's opinion in *Blyew v. United States*, 80 U.S. 581 (1871). In *Blyew*, the Supreme Court addressed the meaning of the word "cases" in Article III's reference, "all cases affecting ambassadors, other public minsters, and consuls." 80 U.S. at 594. The *Blyew* Court explained that "[t]he words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning a proceeding in court, a suit, or action." *Id.* at 595. Like the dictionary definitions from 1828 to now, *Blyew* defines "case" broadly, suggesting that a "criminal case" is not limited to the criminal trial.

We are aided not only by Founding-era dictionary definitions and *Blyew* but also by the Framers' understanding of the phrase "in any criminal case." We have few contemporaneous clues of that understanding, for "references to the privilege [against self-incrimination] are scarce in the literature and debates surrounding the ratification of the Constitution and the Bill of Rights." Michael Edmund O'Neill, *The Fifth Amendment in Congress: Revisiting the*

18

*Privilege Against Compelled Self-Incrimination*, 90 Geo. L.J. 2445, 2486 (2002). But the few existing clues suggest that the Framers viewed the Fifth Amendment as a right in pretrial proceedings as well as at trial.

One clue involves the changes in the Fifth Amendment from drafting to ratification. The amendment had been drafted by James Madison, who omitted the phrase "criminal case":

> No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence; *nor shall be compelled to be a witness against himself*; nor be deprived of life, liberty, or property, without due process of law; nor be obliged to relinquish his property, where it may be necessary for public use, without just compensation.

James Madison, Remarks in Debate in the House of Representatives (June 8, 1789) (emphasis added), *reprinted in* 1 *Debates and Proceedings in the Congress of the United States* 448, 451-52 (Joseph Gales ed., 1834); United States Congress, *Debates and Proceedings in the Congress of the United States* 451-52 (Washington, D.C. 1834). This language "applied to civil as well as criminal proceedings and in principle to any stage of a legal inquiry, from the moment of arrest in a criminal case, to the swearing of a deposition in a civil one." Leonard W. Levy, *Origins of the Fifth Amendment* 423 (1968).

19

In the floor debate on whether to adopt the Bill of Rights, Representative Laurance expressed concern that Madison's wording would conflict with "laws passed." Statement of Representative John Laurance (Aug. 17, 1789), *reprinted in* 1 *Debates and Proceedings in the Congress of the United States* 782, 782. To avoid this conflict, Representative Laurance proposed to add the phrase "in any criminal case." *Id.* Representative Laurance's language was accepted in the House and Senate. Leonard W. Levy, *Origins of the Fifth Amendment* 424-26 (1968).

It is unclear which "laws" Representative Laurance was talking about. One possibility was the proposed Judiciary Act, which would allow the judiciary to compel production of documents in civil cases.[5] *See United States v. Hubbell*, 530 U.S. 27, 53-54 n.3 (2000) (Thomas, J., concurring). Another possibility was the Collections Act, which allowed officials to require oaths in customs declarations. Act of July 31, 1789, ch. 5 section 13, 1 Stat. 29, 39-40; *see* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 705 n.450 (1999). But whichever law was at risk,

---

[5] When Representative Laurance proposed to add the phrase "in any criminal case," the Judiciary Act of 1789 had passed in the Senate and remained pending in the House of Representatives. Michael Edmund O'Neill, *The Fifth Amendment in Congress: Revisiting the Privilege Against Compelled Self-Incrimination*, 90 Geo. L.J. 2445, 2484 (2002).

Representative Laurance was apparently trying to distinguish between potential criminal liability and civil liability. *See* Thomas Y. Davies, *Farther and Farther from the Original Fifth Amendment: The Recharacterization of the Right Against Self-Incrimination as a "Trial Right" in* Chavez v. Martinez, 70 Tenn. L. Rev. 987, 1017 (2003) ("[R]egardless of which provision Laurance referred to, it is still the case that his concern was not to limit the right to criminal trials as such but only to preserve the distinction that the right applied only to potential criminal liability rather than civil liability.").

When Representative Laurance proposed to confine the Fifth Amendment to a "criminal case," there was a consensus that the right against self-incrimination was not limited to a suspect's own trial. To the contrary, "the historical sources show that the right against self-accusation was understood to arise primarily in pretrial or pre-prosecution settings rather than in the context of a person's own criminal trial." *Id.* at 1017-18. If this right were limited to one's own trial, the right would have served little purpose, for criminal defendants were then unable to testify in their own criminal cases. *See Ferguson v. Georgia*, 365 U.S. 570, 574 (1961) (stating that when the United States was formed, "criminal defendants were deemed incompetent as witnesses").

The most natural place for concern about compelled testimony would have been in proceedings outside of criminal trials, such as grand jury proceedings. *See* David Rossman, *Conditional Rules in Criminal Procedure: Alice in Wonderland Meets the Constitution*, 26 Ga. St. U.L. Rev. 417, 488 (2010).

After adopting Representative Laurance's language, the Senate reorganized the cluster of rights that ultimately went into the Fifth and Sixth Amendments. "In what was to be the Sixth Amendment the Senate clustered together the procedural rights of the criminally accused after indictment." Leonard W. Levy, *Origins of the Fifth Amendment* 427 (1968); *see also* Thomas Y. Davies, *Farther and Farther from the Original Fifth Amendment: The Recharacterization of the Right Against Self-Incrimination as a "Trial Right" in* Chavez v. Martinez, 70 Tenn. L. Rev. 987, 1013 (2003) ("[T]he Sixth Amendment plainly deals with rights that protect 'the accused' during the court phase of prosecutions, including trials."). This grouping of Sixth Amendment rights omitted the right against self-incrimination, which was put into the Fifth Amendment with other rights that unambiguously extended to pretrial proceedings as well as the trial:

> That the self-incrimination clause did not fall into the Sixth Amendment indicated that the Senate, like the House, did not intend to follow the implication of

22

> [Section 8 of the 1776 Virginia Declaration of Rights] . . . that the right not to give evidence against oneself applied merely to the defendant on trial. The Sixth Amendment, referring explicitly to the accused, protected him alone. Indeed the Sixth Amendment, with the right of counsel added, was the equivalent of Virginia's Section 8 and included all of its rights except that against self-incrimination. Thus, the location of the self-incrimination clause in the Fifth Amendment rather than the Sixth proves that the Senate, like the House, did not intend to restrict that clause to the criminal defendant only nor only to his trial. The Fifth Amendment, even with the self-incrimination clause restricted to criminal cases, still puts its principles broadly enough to apply to witnesses and to any phase of the proceedings.

Leonard W. Levy, *Origins of the Fifth Amendment* 427 (1968); *see also* Thomas Y. Davies, *Farther and Farther from the Original Fifth Amendment: The Recharacterization of the Right Against Self-Incrimination as a "Trial Right" in* Chavez v. Martinez, 70 Tenn. L. Rev. 987, 1009-13 (2003) ("[T]he right against compelled self-accusation is in the wrong amendment to be a 'trial right.'"); Michael J. Zydney Mannheimer, *Ripeness of Self-Incrimination Clause Disputes*, 95 J. Crim. L. & Criminology 1261, 1322 (2005) ("It appears that the placement of the Self-Incrimination Clause in the Fifth Amendment rather than the Sixth signifies that a 'criminal case' can exist before a 'criminal prosecution[]' commences." (alteration in original)).

In sum, there is nothing to suggest that the Framers were seeking to confine the right against self-incrimination to trial. The

Founders apparently viewed the right more broadly, envisioning it to apply beyond the trial itself.

The defendants argue that this interpretation of the Fifth Amendment is impractical because pretrial proceedings are often used to determine whether evidence is admissible at trial. We disagree.

For this argument, the defendants contend that courts have held in other contexts that evidence may be used in pretrial proceedings even if the evidence would be inadmissible at trial.[6] The defendants attempt to import this practice into the Fifth Amendment context. This attempt avoids the question by assuming that the use of compelled statements in pretrial proceedings is not rendered inadmissible by the Fifth Amendment. If the Fifth Amendment applies to pretrial proceedings, the evidence would be considered inadmissible in pretrial proceedings as well as at trial. As a result, the defendants' argument does not help us decide whether the Fifth Amendment precludes use of compelled statements in pretrial proceedings.

---

[6] The defendants also observe that the Fifth Amendment does not apply to physical evidence. Appellees' Br. at 25. But the defendants do not tie this observation to their argument for limiting the Fifth Amendment to a trial right.

24

* * *

Mr. Vogt alleged that his compelled statements had been used in a probable cause hearing. As a result, we conclude that Mr. Vogt has adequately pleaded a Fifth Amendment violation consisting of the use of his statements in a criminal case.[7]

## IV. We affirm the dismissal of the claims against the individual police officers and the City of Haysville.

Though we conclude that Mr. Vogt has adequately pleaded the use of his compelled statements in a criminal case, we affirm the dismissal of the (1) claims against the four police officers based on

---

[7] The defendants argue that Mr. Vogt

is not entitled to rely upon an inference that his alleged admissions were "admitted into evidence through witness testimony." Aplt. Brief, p. 31. No facts have been pled regarding the admission of any self-incriminatory statements into evidence or any witness testimony based thereon, and such facts cannot be reasonably inferred, because they are flatly inconsistent with the fact that the charges against Vogt were dismissed. The only reasonable inference to be drawn from the fact of dismissal is that Vogt's admissions (if any) were not admitted into evidence by the court.

Appellees' Br. at 37. We disagree. Mr. Vogt's complaint states that the "compelled statements and fruits thereof were used against him in a criminal case." Appellant's App. at 15. At this stage, we can reasonably infer that these statements were used to support probable cause.

qualified immunity and (2) claims against the City of Haysville based on its lack of compulsion in Mr. Vogt's making of a self-incriminating statement.

## A. The four police officers are entitled to qualified immunity.

We conclude that the four police officers are protected by qualified immunity.

Qualified immunity would protect the officers from suit in the absence of factual allegations plausibly showing the violation of a clearly established constitutional right. *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).

We apply this test to the constitutional violation: compulsion of self-incriminating statements that were ultimately used in a probable cause hearing. We have already decided that Mr. Vogt's right against self-incrimination was violated when his compelled statements were used in a probable cause hearing in 2014.[8] For the sake of argument, we will also assume that this right was violated in 2013 and 2014 when Mr. Vogt's compelled statements were allegedly used to develop investigatory leads, initiate a criminal investigation,

---

[8] We need not decide whether uses before the probable cause hearing would have constituted additional violations of the Fifth Amendment.

26

and bring charges. Thus, we must decide whether Mr. Vogt's Fifth Amendment right was clearly established when these violations took place. In our view, the state of the law was not clearly established when Mr. Vogt's compelled statements were allegedly used.

For a constitutional right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as [Mr. Vogt] maintains." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1108 (10th Cir. 2008).

Until today, the applicability of the Fifth Amendment to pretrial proceedings remained unsettled, for the Supreme Court had declined to decide "the precise moment when a 'criminal case' commences"[9] and we had declined to decide whether the Fifth Amendment applied to pretrial proceedings.[10] And outside our circuit, courts had disagreed about the applicability of the Fifth Amendment

---

[9]  *Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003) (plurality opinion).

[10]  *See Koch v. City of Del City*, 660 F.3d 1228, 1245 (10th Cir. 2011) (avoiding this issue by concluding that when the plaintiff was arrested, "it was not clearly established that an individual has a Fifth Amendment right to refuse to answer an officer's questions during a *Terry* stop"); *Eidson v. Owens*, 515 F.3d 1139, 1149 (10th Cir. 2008) (refraining from defining the scope of the right against self-incrimination because the plaintiff "never incriminated herself during a custodial interrogation").

27

to pretrial proceedings. *See Mocek v. Albuquerque*, 813 F.3d 912, 929 n.9 (10th Cir. 2015) ("A circuit split will not satisfy the clearly established prong of qualified immunity."). Thus, when the police officers acted, they could not have known that the Fifth Amendment would be violated by the eventual use of the compelled statement to develop investigatory leads, initiate a criminal investigation, bring charges, or support the prosecution in a probable cause hearing. As a result, the alleged constitutional violation was not clearly established.

In similar circumstances, the Ninth Circuit Court of Appeals took a different approach. That court interpreted the Fifth Amendment to apply in a pretrial hearing to determine whether to release or detain the defendant. *Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009). This interpretation required the court to determine whether a police detective enjoyed qualified immunity after compelling a statement that was later used in a hearing to determine release or detention. *See id.* at 927-28. To decide qualified immunity, the court considered the underlying purpose of qualified immunity, which was to prevent deterrence of reasonable officers trying to carry out their duties. *Id.* at 927. This purpose led the court to "focus on [the] officer's duties, not on other aspects of the constitutional violation." *Id.*

28

Focusing on the officer's duties, the court declined to permit qualified immunity because the police detective had been on notice that coercion of a confession could ripen into a Fifth Amendment violation. *Id.* And once the police detective coerced a confession and turned it over to the prosecutor, the detective's role in the constitutional violation was complete. *Id.* at 927-28. Thus, the Ninth Circuit did not tarry over whether the detective would have known which uses would violate the Fifth Amendment; he knew all along that coercing a confession could lead to a Fifth Amendment violation. *Id.* As a result, the Ninth Circuit determined that the detective was not entitled to qualified immunity. *Id.*

We respectfully disagree with this approach. The Ninth Circuit appeared to acknowledge that its test would allow police officers to incur personal liability for contributing to a constitutional violation that had not been clearly established. *See id.* at 913 ("[T]he aspects of the pertinent law not clearly established at the time of the confession did not affect [the detective]'s role in bringing about the violation."). But qualified immunity protects officers from liability when the misconduct did not violate a clearly established right. *See* pp. 26-27, above.

The four police officers allegedly compelled a statement used before trial but not in an actual trial. Until now, the precedents had

29

not clearly determined whether these uses would have violated the Fifth Amendment. Thus, even if the police officers could have anticipated the eventual use in a probable cause hearing, they could not have known that this use would violate the Fifth Amendment. Thus, we reject the approach taken in the Ninth Circuit.

\* \* \*

Because it was not clearly established in 2013 or 2014 that the pretrial use of Mr. Vogt's statements would violate the Fifth Amendment, the four police officers are entitled to qualified immunity.

### B. Mr. Vogt did not adequately allege that Haysville had compelled the making of a self-incriminating statement.

As noted, Haysville conditioned its job offer to Mr. Vogt: he would get the job only if he told the Hays police department that he had taken the knife. According to Mr. Vogt, this condition compelled him to make self-incriminating statements to the City of Hays; Haysville responds that the condition on the job offer was not coercive. We agree with Haysville, concluding that the condition on the job offer did not compel Mr. Vogt to make a self-incriminating statement. Thus, we affirm the dismissal of the claim against Haysville.

30

The issue stems from the Supreme Court's opinion in *Garrity v. New Jersey*, 385 U.S. 493 (1967). There the Court held that public employers cannot require their employees to waive the right against self-incrimination as a condition of continued employment. 385 U.S. at 497-98, 500. In that case, police officers under investigation faced discharge if they refused to answer incriminating questions without immunity from criminal prosecution. *Id.* at 494, 497. In the Court's view, the officers faced a Hobson's choice amounting to compulsion: they had to decide between avoiding self-incrimination and losing their jobs. *Id.* at 497-98, 500. Because the incriminating answers had been compelled, they could not be used against the officers in a subsequent criminal proceeding. *Id.*

*Garrity* has been applied outside of the conventional employment relationship. *See, e.g.*, *Lefkowitz v. Turley*, 414 U.S. 70, 82-83 (1973) (extending *Garrity* to public contractors); *Spevack v. Klein*, 385 U.S. 511, 514, 516 (1967) (applying the Fifth Amendment to potential disbarment). Thus, the Fifth Amendment may be triggered even by the threatened loss of an unsalaried position. For example, in *Lefkowitz v. Cunningham*, the Supreme Court invalidated a state law requiring officers of political parties to either waive their right against self-incrimination or suffer automatic termination from office and a five-year disqualification from public office. 431 U.S.

31

801, 802-04 (1977). Though the political officers were unpaid, the Court held that the law had presented "grave consequences" because "party offices carry substantial prestige and political influence." *Id.* at 807. The Court also noted the law's potential economic consequences, for the claimant would suffer from the loss of professional standing and the possibility of holding future public offices. *Id.* In addition, the Court pointed out that the law was coercive because it impinged on an individual's right to participate in private, voluntary political associations—a key facet of the freedom guaranteed by the First Amendment. *Id.* at 807-08.

In each of these cases, individuals were threatened with the loss of some benefit or the infringement of an important right that they already enjoyed. These individuals already had a job, government contract, or right that was being threatened upon exercise of the right against self-incrimination. Our circumstances are different. Mr. Vogt was never an employee of Haysville, and his conditional job offer did not threaten the loss of livelihood or an existing job.

If Mr. Vogt had not wanted to incriminate himself, he could have declined the job offer and continued working for Hays. With that alternative freely available, Mr. Vogt was under no compulsion to comply with Haysville's condition to its job offer.

Mr. Vogt argues that Haysville threatened his ongoing employment relationship with Hays by promising to verify his future disclosure to Hays. According to Mr. Vogt, this threat created an additional measure of compulsion. But the complaint does not suggest that Haysville would contact the City of Hays even if Mr. Vogt had declined the employment offer. In fact, the complaint alleges that the City of Haysville promised to "follow-up with Hays to ensure that [Mr. Vogt] had complied with this *condition of employment*." Appellant's App. at 14 (emphasis added).

33

Because the complaint characterizes the disclosure requirement as a condition of the job offer, the only reasonable inference is that Haysville would not verify anything if Mr. Vogt were to decline the job offer. Thus, Haysville's promise to follow up with Hays did not compel Mr. Vogt to make a self-incriminating statement.

* * *

We conclude that the conditional job offer was not coercive. On this basis, we affirm the dismissal of the claim against Haysville.

## V.     Mr. Vogt has stated a valid claim against the City of Hays.

Hays urges three additional grounds for dismissal: (1) Mr. Vogt has not adequately pleaded causation; (2) Hays cannot incur liability because no one with final policymaking authority violated the Constitution; and (3) violation of the Fifth Amendment cannot serve as the basis for a § 1983 claim.[11] We reject these arguments.

### A.     Mr. Vogt has adequately pleaded causation.

---

[11]     Hays also argues that (1) witnesses in criminal proceedings enjoy absolute immunity from civil liability arising out of their testimony and (2) individuals testifying at trial do not act under color of law. But Mr. Vogt does not allege that the defendants acted unlawfully by testifying during the probable cause hearing. Rather, Mr. Vogt alleges that Hays unconstitutionally compelled him to incriminate himself. Though the use of those statements in the probable cause hearing would complete the alleged Fifth Amendment violation, the act of testifying does not serve as the basis of Mr. Vogt's claims.

34

Hays argues that it did not cause a violation of the Fifth Amendment. Rather, Hays submits that it merely gave Mr. Vogt's compelled statements to the Kansas Bureau of Investigation, pointing out that Hays did not make the decision to pursue criminal charges or to use the statements in pretrial proceedings.

Section 1983 imposes liability on a state actor who "causes to be subjected . . . any citizen . . . to the deprivation of any rights." 42 U.S.C. § 1983. This language must be read against the backdrop of tort law, which makes individuals responsible for the natural consequence of their actions. *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012). Thus, causation exists if Hays initiated actions that it knew or reasonably should have known would cause others to deprive Mr. Vogt of his right against self-incrimination. *Id.* Accordingly, Hays could incur liability even if it had been someone else who used the compelled statements in a criminal case.

Mr. Vogt alleges in the complaint that Hays compelled self-incriminating statements, then initiated a criminal investigation that ended with use of the incriminating statements in a probable cause hearing. The complaint states that

35

- Mr. Vogt reported information to Hays concerning the knife,

- the Hays police chief conditioned Mr. Vogt's continued employment as a Hays police officer on his documenting the facts related to possession of the knife,

- Mr. Vogt wrote a vague one-sentence report, and

- a Hays police officer elicited further details about Mr. Vogt's possession of the knife.

The complaint adds that the Hays police chief then requested a criminal investigation of Mr. Vogt and furnished incriminating statements to investigators, which led to use of the incriminating statements in a probable cause hearing.

Taking these allegations as true, we conclude that Mr. Vogt adequately pleaded that Hays had started a chain of events that resulted in violation of the Fifth Amendment. *See Stoot v. Everett*, 582 F.3d 910, 926-27 (9th Cir. 2009) (concluding that a police officer, who allegedly coerced statements, may incur liability under § 1983 for violation of the Fifth Amendment when a prosecutor used those statements in a criminal case); *McKinley v. Mansfield*, 404 F.3d 418, 436-39 (6th Cir. 2005) (holding that police officers can incur § 1983 liability for allegedly coercing a suspect to make self-incriminating statements even though it was another person, the prosecutor, who used the statements in a criminal case).

36

**B.     Mr. Vogt adequately pleaded that the Fifth Amendment violation had been committed by someone with final policymaking authority for the City of Hays.**

Hays argues that it cannot incur liability for actions by the Hays police chief because he was not a final policymaker for the city. We disagree.

Cities cannot incur liability under § 1983 on a *respondeat superior* theory, but can be liable if a final policymaker takes unconstitutional action. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Dill v. City of Edmond*, 155 F.3d 1193, 1211 (10th Cir. 1998). "Whether an individual is a final policymaker for purposes of § 1983 liability 'is a legal issue to be determined by the court based on state and local law.'" *Dill*, 155 F.3d at 1210 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995)). Mr. Vogt pleaded facts indicating that the Hays police chief was a final policymaker on the requirements for police employees.

This inquiry turns on whether the Hays police chief had authority to establish official policy on discipline of employees within the police department. *See id*. at 1211 (stating that whether the municipal police chief at the time of the alleged violation was "a final policymaker turns on whether he had the authority to establish official city policy on employee transfers and discipline within the

37

police department"). To make this determination, we consider whether the police chief's decisions were constrained by general policies enacted by others, whether the decisions were reviewable by others, and whether the decisions were within the police chief's authority. *Randle*, 69 F.3d at 448.

The complaint alleges that the Hays police chief had final policymaking authority for the police department. There is nothing in the complaint to suggest that his decisions were subject to further review up the chain-of-command.

Hays argues that final policymaking authority rested with the City Manager and City Commission rather than the Police Chief. For this argument, Hays points to municipal ordinances stating that the city commission must hire a city manager, who appoints the police chief and administers city business. But the city ordinances do not specify who bears ultimate responsibility for discipline of police officers like Mr. Vogt.

We addressed a similar situation in *Dill v. City of Edmond*, 155 F.3d 1193 (10th Cir. 1998). That case involved a due process violation from a change in a police officer's position from detective to patrol officer. 155 F.3d at 1210. There the municipal charter designated the city manager as the municipality's administrative head, who had authority to appoint and remove the police chief and

to hire and fire employees. *Id.* at 1211. Notwithstanding the city manager's powers, we concluded that the police chief was a final policymaker for disciplinary transfers of police officers. We had four reasons for this conclusion:

1.     The city ordinances had not directly stated who was authorized to determine the policy on transfers and discipline.

2.     Trial testimony had indicated that the transfer was based on a policy adopted by the police chief.

3.     The city manager had testified that he did not involve himself with transfers.

4.     The decision to transfer the plaintiff had fallen within the authority of the police chief.

*Id.*

We took a similar approach in *Flanagan v. Munger*, 890 F.2d 1557 (10th Cir. 1989). There too the issue was whether the municipal police chief had final policymaking authority for disciplinary decisions within the police department. 890 F.2d at 1568. In that case, the municipality admitted that the police chief had final authority to issue reprimands for its officers—an admission that we described as effectively disposing of the municipal liability issue. *Id.* Notwithstanding this admission, we analyzed the municipality's argument that the police chief lacked final policymaking authority under the municipal code. The municipality pointed out that

39

- the city manager had to manage and supervise all matters related to the police department, its officers, and employees,

- the city manager could set aside any action taken by the police chief and "supersede any department head in the functions of his position," and

- "[t]he rules of the Civil Service Commission … govern[ed] disciplinary matters relative to uniformed personnel [e.g., review by City Council] except as otherwise provided by charter or ordinance."

*Id.* (quoting the city's municipal code) (alterations in original).

We acknowledged that the police chief's decisions were subject to review by the city manager and city council. *Id.* Nonetheless, we held that the police chief had final policymaking authority for disciplinary decisions within the police department. *Id.* at 1568-69.

We had two reasons. First, the municipal code empowered the police chief to directly manage and supervise the force and made him "responsible for the discipline, good order and proper conduct of the Department, [and] the enforcement of all laws, ordinances and regulations pertaining thereto." *Id.* (quoting the city's municipal code) (alteration in original). Second, the municipal code did not create a mandatory or formal review of the police chief's action. *Id.* at 1569. Thus, we concluded that "for all intents and purposes the [police chief's] discipline decisions [were] final" and that "any meaningful administrative review [was] illusory." *Id.* at 1569. This

40

conclusion led us to hold that the police chief had final policymaking authority even under the municipal code. *Id.*

Under *Dill* and *Flanagan*, we conclude that Mr. Vogt has adequately pleaded final policymaking authority on the part of the Hays police chief. As in *Dill* and *Flanagan*, the city has pointed to general supervisory responsibilities of the city manager. But there is nothing in the municipal ordinances suggesting that the city manager plays a meaningful role in disciplinary decisions within the police department. The absence of such provisions is fatal at this stage, where we must view all of the allegations and draw all reasonable inferences in favor of Mr. Vogt. *See Dias v. City and Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). As a result, we conclude that Mr. Vogt has adequately pleaded final policymaking authority on the part of the Hays police chief.

### C. Violation of the Fifth Amendment can serve as the basis for liability under § 1983.

In a single sentence, Hays contends that "*Chavez* held there is no claim for civil liability under the Fifth Amendment and that claims related to securing compelled/coerced statements required egregious government action under a substantive due process analysis." Appellees' Br. at 20. Hays does not explain or support this

41

sentence, and it is incorrect. *Chavez* did not make such a holding. Thus, Hays's single sentence does not support the dismissal.

## VI. Disposition

We affirm the dismissal of the claims against the City of Haysville and the four police officers. We reverse the dismissal of the claim against the City of Hays and remand for further proceedings consistent with this opinion.

15-3266 – *Vogt v. City of Hays, et al.*

**HARTZ,** Circuit Judge, concurring:

I join Judge Bacharach's opinion for the panel. I write separately to emphasize the limits of what we are saying. We have addressed only issues raised by the parties. Some of the questions we have not answered are: (1) Even though the Fifth Amendment privilege against self-incrimination can be violated by use of the defendant's statements at a probable-cause hearing, can there be a violation when such use does not cause a criminal sanction to be imposed on the defendant (such as when, as here, the court does not find probable cause)? (2) When a person voluntarily discloses information to a government agency, does he or she thereby waive any Fifth Amendment objection to disclosing that same information to another government agency? (3) Under what circumstances can an employee who has given notice of resignation claim that a request for incriminatory information was coercive? And, most significantly, (4) In light of post-*Garrity* developments in Fifth Amendment doctrine, if a public employee believes that he or she is being coerced by the employer into making self-incriminatory statements, must the employee invoke the privilege against self-incrimination by refusing to provide information, or can the employee still, as in *Garrity*, provide the information and then demand immunity from use of the information? *See* Peter Westen, Answer Self-Incriminating Questions or Be Fired, 37 Am. J. Crim. L. 97 (2010).