**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 7, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LAWRENCE RUBIN MONTOYA,

        Plaintiff - Appellee,

    v.

DETECTIVE MARTIN E. VIGIL
(Shield No. 86-12); DETECTIVE
MICHAEL MARTINEZ (Shield No.
82-29); and LIEUTENANT
JONATHAN W. PRIEST (Shield No.
86-12),

        Defendants - Appellants,

and

CITY OF COUNTY OF DENVER;
and OFFICERS JOHN DOE, in their
individual and official capacities.

        Defendants.

No. 17-1106

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:16-CV-01457-RPM)**

---

Peter H. Doherty (Leif O. Distad with him on the briefs), Lasatar & Martin, Highlands Ranch, Colorado, for Appellants.

Jane Fisher-Byrialsen, Fisher & Byrialsen, Denver, Colorado, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **BACHARACH**, Circuit Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

A jury convicted fourteen-year-old Lawrence Montoya for the New Year's Day murder of a teacher from his school. After serving over thirteen years in prison, Montoya brought post-conviction claims for ineffective assistance of counsel and actual innocence. The prosecution agreed to a compromise resulting in Montoya's release from prison. He then sued several detectives involved in the investigation and trial, claiming they were responsible for his wrongful conviction. Alleging constitutional violations under 42 U.S.C. § 1983, Montoya claims the Detectives instigated a malicious prosecution against him, coerced his confession in violation of the Fifth Amendment, and subjected him to false arrest.

The district court held qualified immunity and absolute testimonial immunity did not shield the Detectives from liability, and denied their motion to dismiss. The Detectives filed this interlocutory appeal. We hold qualified immunity shields the Detectives from liability for Montoya's malicious prosecution claim. We further conclude both qualified immunity and absolute testimonial immunity bar Montoya's Fifth Amendment claim. As for Montoya's false arrest claim, we lack jurisdiction to consider whether or not qualified immunity applies.

-2-

# I. Background

## A. The Crime and Investigation

On the morning of New Year's Day in 2000, a neighbor found Emily Johnson, a 29-year-old Denver school teacher, almost lifeless in her backyard. Ms. Johnson died shortly thereafter. She had been beaten to death at her home, and her white Lexus was gone.

Martin Vigil and Michael Martinez, detectives with the Denver Police Department, investigated the crime. After receiving a tip, they interviewed Nicholas Martinez, who said that he and his cousin, Lloyd Martinez, had found Ms. Johnson's Lexus unlocked with the keys on the floor. They had taken the car, Martinez said, and picked up friends for a joy ride—nothing more. Police interviewed a number of people Martinez mentioned—including Luke Anaya, Montoya's cousin—but none directly implicated Montoya in the robbery and murder.[1] Still, some of the persons implicated were either family or friends of Montoya, and the Detectives eventually decided to interview Montoya.

On January 10, 2000, beginning at about 8:00 PM, the Detectives questioned Montoya about the crime. Montoya was fourteen years old and in the

---

[1] There is some lack of clarity on this point. Montoya alleges no one implicated him directly, but Detective Vigil testified that Nicholas Martinez made reference to Montoya. App. 259, 273. And in his complaint, Montoya admits that Nicholas Martinez mentioned he had picked up "Freddie's brother" for the joy ride, *id.* at 750 ¶ 32, which may have been a reference to Montoya. *Id.* at 733–34.

eighth grade at the time.  According to the complaint, "it was apparent that [Montoya] suffered from clear cognitive deficiencies and developmental delays." App. 752 ¶ 46.  Though his mother was present for approximately the first forty minutes of the interview, both he and his mother consented to letting the police interrogate Montoya alone after that.

In the questioning that followed—recorded on video—Montoya alleges the officers coerced him into confessing to the robbery.  They did so, he claims, by falsely claiming they had evidence linking him to the crime, asking leading questions, feeding him statements, illegally searching his shoes, and intimidating him.  Montoya initially admitted to having been present for the joy ride, but denied any involvement in the robbery and murder.  He insisted he was asleep at the time of the early-morning assault.  In fact, he claimed he had not met Nicholas Martinez until Martinez and some acquaintances picked him up for the joy ride.  After maintaining this denial for about two hours (including the forty minutes during which his mother was present), Montoya admitted he was at Ms. Johnson's house.  A bit later, he further admitted he had been involved in the robbery.  At first, Montoya only said he had been a lookout, but upon further questioning he said he entered the house too.  The entire interrogation lasted approximately two and a half hours.[2]

_____

[2]  We may take into account the interrogation video Montoya attached to
(continued...)

-4-

With that confession in hand, the Detectives obtained an arrest warrant. As the complaint recounts it, however, many of the details Montoya provided during his confession were factually incorrect—proof of his innocence. Montoya alleges this could not have escaped the Detectives' notice, and yet the Detectives' affidavit in support of the arrest warrant intentionally misrepresented Montoya's statements and omitted exculpatory evidence.

Montoya was then charged with Felony Murder, Aggravated Robbery, First Degree Burglary, and First Degree Aggravated Vehicle Theft. Before trial, the court excluded all statements Montoya made after his mother left the room—including his confession to being present at the robbery and murder—because Montoya's mother had not signed a written parental waiver required by statute.

### B. The Trial

In a joint trial including Nicholas Martinez and Lloyd Martinez, the prosecution argued Montoya was actively involved in Ms. Johnson's robbery and murder. To support this theory, the state presented several witnesses. Matthew Hernandez, a juvenile in custody at the same detention center as Montoya, testified Montoya had told him he was guilty of the crime. Lieutenant Jonathan

---

[2](...continued)
his complaint. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Scott v. Harris*, 550 U.S. 372, 379 (2007).

Priest, a defendant in this case, testified as a crime scene expert and corroborated the details Hernandez put forward. And Detective Vigil—another defendant here—provided testimony regarding Montoya's interrogation. Though Vigil's testimony was supposed to be limited to the portion of the interrogation during which Montoya's mother was present, Montoya claims Vigil strayed into impermissible territory. In two instances, Montoya alleges Vigil testified about statements he made during the *suppressed* part of his interrogation—the part he argues was coercive.

The prosecution also presented physical evidence to link Montoya to the crime. The state argued a pair of "Lugz" boots matching the footprints at the crime scene belonged to Montoya. As proof of Montoya's ownership, Detective Vigil testified the boots were found in a bedroom that Montoya's aunt had said belonged to Montoya. Police had also found a Broncos jacket at the crime scene, and the Prosecution argued it was Montoya's. One more piece of evidence tied Montoya to the scene, albeit only to the joy ride *after* the murder: police recovered Montoya's fingerprint from the rear passenger door of Ms. Johnson's stolen Lexus.

This evidence did not go unchallenged. Montoya denied the jacket and shoes were his—insisting the shoes, at least, belonged to his cousin, Luke Anaya. Montoya's aunt, Tomasita Martinez, corroborated Montoya's side of the story. Contradicting Detective Vigil's testimony, she testified that the bedroom in which

the boots were found was actually Luke's room, not Montoya's. Montoya did not challenge the fingerprint evidence, as he admitted having joined the others for the joy ride. He only contested his participation in the robbery.

The jury convicted Montoya of first-degree felony murder, aggravated robbery, and first-degree burglary. The court sentenced Montoya to life in prison without the possibility of parole.

### C. The Post-Conviction Compromise and Release

Over thirteen years after his conviction, Montoya filed a Rule 35(c) petition for post-conviction relief under Colorado law, alleging his trial counsel had been ineffective and that he was actually innocent of the crimes for which he was convicted.

As support, Montoya attached a private investigator's affidavit casting doubt on the evidence at trial. The investigator claimed to have interviewed Nicholas Martinez as well as Martinez's mother. According to the investigator, Martinez admitted he had not met Montoya until *after* he had stolen the Lexus, during the joy ride. Martinez also allegedly said that Montoya had not been present during the crime, the details Montoya provided during his interrogation were all incorrect, and the Broncos jacket—which the prosecutors had argued was Montoya's—was in fact his. Martinez's mother corroborated this last statement, alleging she had told Montoya's defense attorney the Broncos jacket was Nick's and had even showed him a family picture in which Nick was wearing the jacket.

Montoya then requested permission to conduct DNA tests on the physical evidence presented at trial—among other items, the boots and Broncos jacket presented to tie Montoya to the scene. The results were not conclusive, but generally supported Montoya's allegations. To start with, some of the DNA samples taken from the Broncos jacket matched Nicholas Martinez and *could not* have been Montoya's. The same is true for the shoes: some samples from the shoe matched Luke Anaya instead of Montoya. But both items also yielded samples with mixtures of DNA from multiple persons that could not be conclusively interpreted one way or the other. Naturally, Montoya could not be excluded as a possible source for those samples. Nonetheless, Montoya emphasizes, the report did not conclusively identify *him* as a source for any of the samples.[3]

After these results came in, the state and Montoya came to an agreement: in exchange for Montoya's guilty plea to a charge of accessory after the fact, the state would confess error on Montoya's ineffective assistance of counsel petition and agree to vacate the convictions for felony murder, aggravated robbery, and burglary.

---

[3] Montoya also tested items that had not been used to tie him to the crime scene. For instance, he also ran DNA tests on the rock used to murder Ms. Johnson. The results for this test were similar to those of the jacket and shoes: some of the DNA samples matched Nicholas Martinez, while some samples contained DNA mixtures that could not be interpreted.

At the hearing on June 16, 2014, the state explained it made the compromise because the ineffective assistance of counsel challenge would have been a "horse race." App. 94–95. The prosecution went on to note the victim's family wanted Montoya to be released, so the agreement was "being entered into in the interest of justice, not so much concession on the 35(c)." App. 94. Montoya's counsel, by contrast, maintained that Montoya's petition would likely have prevailed, but that Montoya agreed to the deal.

Montoya then pleaded guilty to the charge of accessory after the fact—admitting he went for the ride in the Lexus, knew that others in the car had assaulted and probably murdered a woman, and had not told police.[4] The court sentenced Montoya to ten years' imprisonment plus three years of mandatory parole and ran the sentence *nunc pro tunc* beginning in 2000. Since he had already served over thirteen years, Montoya was released.

### D. The § 1983 Suit

---

[4] In his brief, Montoya denies that he admitted to knowing of Ms. Johnson's murder when he pleaded guilty, Aple. Br. at 10 n.3, 49, but the hearing transcript shows otherwise:

> THE COURT: . . . Added Count 6 reads that . . . Montoya . . . unlawfully and feloniously rendered assistance . . . knowing that person had committed the crime of murder . . . To that charge, how do you plead, guilty or not guilty?
> THE DEFENDANT: Guilty, Your Honor.

App. 98.

Montoya brought this § 1983 action against various defendants, including Detectives Vigil, Martinez, and Priest. He claimed the Detectives violated his Fourth Amendment right to be free from malicious prosecution and false arrest, as well as his Fifth Amendment right against self incrimination.

Montoya's complaint insists on his innocence, and calls into question much of the evidence at trial. As at trial, he alleges he was asleep at his girlfriend's house during the murder, and was only picked up for the joy ride in Ms. Johnson's Lexus after her murder. As proof, Montoya argues the DNA results, along with his aunt's testimony and the investigator's affidavit, establish that both the boots and Broncos jacket the prosecution had insisted belonged to Montoya, belonged, in fact, to others. Montoya also attempts to discredit trial testimony. Detective Priest's crime scene testimony was inconsistent with the physical evidence, he says. And he asserts the testimony by Matthew Hernandez—the fellow inmate who claimed Montoya confessed to the crime—was untrustworthy. Not only had Hernandez made inconsistent statements and even some statements that were patently false, but Hernandez never shared a cell with Montoya. All this, Montoya alleges, shows not only his innocence, but the Detectives' malicious prosecution.

The Detectives filed a motion to dismiss, relying, in part, on both qualified and absolute testimonial immunity. The district court denied the motion, and the Detectives filed this interlocutory appeal.

## II. Analysis

The Detectives argue the district court erred by not giving them the benefit of either qualified or absolute immunity against all of Montoya's claims. But before we address the merits, we must consider Montoya's contention that we lack jurisdiction to hear several of the Detectives' arguments.

### A. *Jurisdiction*

This court has appellate jurisdiction over "final decisions" of district courts. 28 U.S.C. § 1291. But when a district court denies government officers qualified immunity or absolute immunity, we can review that decision even before the district court has rendered final judgment. *Mitchell v. Forsyth*, 472 U.S. 511, 525, 530 (1985).

The Detectives invoke our jurisdiction to review the district court's denial of qualified immunity and absolute testimonial immunity. Montoya challenges their ability to do so. In his view, we lack jurisdiction to consider the Detectives' assertion of qualified immunity on the malicious prosecution and false arrest claims, and likewise have no jurisdiction to consider their absolute testimonial immunity arguments. We address each argument in turn.

#### 1. *Jurisdiction Over Questions of Qualified Immunity on the Malicious Prosecution and False Arrest Claims*

Montoya first argues the Detectives cannot avail themselves of our jurisdiction to interlocutorily review questions of qualified immunity for the malicious prosecution and false arrest claims. They cannot do so, Montoya contends, because the Detectives did not properly raise qualified immunity as to those claims before the district court. Since "qualified immunity is an affirmative defense" and "the burden of pleading it rests with the defendant," *Crawford-El v. Britton*, 523 U.S. 574, 586–87 (1998) (quoting *Gomez v. Toledo*, 446 U.S. 635, 639–641 (1980)), the Detectives cannot assert qualified immunity against those claims for the first time on appeal. And since we only have jurisdiction to review questions of immunity at this stage, Montoya argues we should dismiss the Detectives' appeal with respect to those claims.

Before addressing Montoya's specific contentions about the record, we find it useful to explain the basis of our jurisdiction over interlocutory qualified immunity appeals. Montoya's argument assumes the jurisdictional inquiry turns on whether or not the defendants adequately raised qualified immunity before the district court. That is not so. Our jurisdiction is based on district courts' "*decisions*," not on the particular arguments parties make in their briefs below. 28 U.S.C. § 1291 (emphasis added). So the true jurisdictional inquiry is whether or not the district court *decided* the qualified immunity question at issue, not whether the defendants adequately raised the defense. On appeal, the plaintiff can very well argue the court should affirm because the defendant failed to

adequately raise the defense below.  But such an argument would go to the defendant's preservation of a merits argument, not this court's jurisdiction.

That being so, we arrive at a simple rule: if the district court explicitly decided the qualified immunity question, we will usually have jurisdiction over the interlocutory appeal.  There may be, of course, other considerations that remove our jurisdiction over an interlocutory qualified immunity appeal even when the district court explicitly decides the question.  For example, a particular denial of qualified immunity may be too intertwined with questions of evidence sufficiency for our interlocutory review to be appropriate.  *Johnson v. Jones*, 515 U.S. 304, 317 (1995); *Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997).  But in general, if the district court decided the qualified immunity question, we have jurisdiction to review it—regardless of whether or not the defendant properly raised the defense.

The reverse of this rule is not true, however.  A district court's *failure* to expressly decide the qualified immunity question does not necessarily mean we *lack* jurisdiction, because the district court's silence can operate as an implicit denial that is immediately appealable.  *E.g.*, *Lowe v. Town of Fairland*, 143 F.3d 1378, 1380 (10th Cir. 1998).  In this context, it becomes important to make sure the defendants explicitly raised the defense.  For how could the district court implicitly decide a question that was not clearly before it?  If the defendant did not expressly raise the defense, we cannot interpret the district court's silence as

-13-

an implicit denial of qualified immunity at that stage in the litigation. And that means there is no decision denying qualified immunity for us to review.

With these maxims in mind, we turn to the jurisdictional questions here. It is clear we have jurisdiction over the qualified immunity question regarding Montoya's malicious prosecution claim. The district court explicitly decided that issue, holding Montoya had pleaded facts "show[ing] malicious prosecution" under "clearly established law." App. 738. We may review that holding in this interlocutory appeal. As explained earlier, Montoya may argue the Detectives forfeited their immunity defense at this stage in the litigation, but this would be a reason to affirm the district court on other grounds, not to dismiss for lack of jurisdiction.

It is equally clear, however, that we lack jurisdiction to review the qualified immunity question with respect to the false arrest claim. The district court never mentioned that question. And we cannot conclude this omission was an implicit denial because the Detectives did not expressly raise the defense below. Having reviewed the briefing below, we cannot find a single instance in which the

Detectives raised qualified immunity against Montoya's false arrest claim.[5]

Instead, they only argued Montoya failed to state a claim for false arrest.

The Detectives resist this result by offering a different reading of the record—indeed, a different reading of what it means to assert qualified immunity. As they see it, arguing Montoya failed to state a claim for false arrest under Rule 12(b)(6) is the same as invoking qualified immunity. Since a government official is entitled to qualified immunity when "the facts that a plaintiff has alleged" fail to "make out a violation of a constitutional right," *see Pearson v. Callahan*, 555 U.S. 223, 232 (2009), the Detectives contend that a failure-to-state-a-claim argument is really a qualified immunity argument by another name.

That is not correct. It is true that if the plaintiff failed to state a claim under Rule 12(b)(6), the government would also be entitled to qualified immunity. But we have already held that "[a]lthough to a certain extent a qualified immunity analysis overlaps with a 12(b)(6) analysis, we do not have jurisdiction to review the merits" of a Rule 12(b)(6) failure-to-state-a-claim argument when the defendant appeals the district court's denial of qualified immunity. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 515–16 (10th Cir. 1998). As the Supreme

---

[5] Defendants point to the following statement the district court made during the motions hearing as evidence they raised qualified immunity with respect to all their claims: "Well, your position, as I got it, then, is that, first of all, there is no constitutional violation; and second, there is qualified immunity?" App. 868–69. Read in context, however, the district court was only referring to defendants' arguments regarding the Fifth Amendment claim.

Court has explained, "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim," and an "appellate court reviewing the denial of the defendant's claim of immunity need not . . . *even determine whether the plaintiff's allegations actually state a claim*." *Mitchell v. Forsyth*, 472 U.S. 511, 527–28 (1985) (emphasis added).

Therefore, although the Rule 12(b)(6) and qualified immunity arguments can be similar—sometimes exceedingly so—they are not the same. And since it is defendants' burden to raise a qualified immunity defense, *Crawford-El*, 523 U.S. at 586–87, a Rule 12(b)(6) failure-to-state-a-claim argument, without more, is insufficient to raise qualified immunity. Standing alone, a defendant's Rule 12(b)(6) argument fails to notify either the district court or the plaintiff that the defendant is invoking qualified immunity—with all its attendant complexity and possibility for interlocutory appeal.

In short, the Detectives' Rule 12(b)(6) argument did not adequately raise a qualified immunity defense against the false arrest claim, and therefore the district court's silence cannot be construed as an implicit denial of immunity.

We consequently have no jurisdiction to hear the Detectives' qualified immunity arguments against Montoya's false arrest claim.[6] Before us are the Detectives' qualified immunity arguments concerning only two claims: the claim they maliciously prosecuted Montoya and the claim they violated Montoya's Fifth Amendment rights.

### 2. *Jurisdiction Over Claims of Absolute Immunity*

Montoya also claims we lack jurisdiction to review the Detectives' assertion of absolute testimonial immunity. He admits the Detectives squarely raised the defense below, but argues the district court did not squarely address absolute immunity. We disagree. The district court explained that absolute testimonial immunity "would apply" under different circumstances, but that in this case "[t]he plaintiff has shown sufficient facts which, if proven at trial, negate absolute immunity." App. 737–38.

This is an immediately appealable ruling on absolute immunity. *See Mitchell*, 472 U.S. at 525; *Woodruff v. Covington*, 389 F.3d 1117, 1122–23 (10th Cir. 2004). Indeed, elsewhere in his brief Montoya recognizes the district court ruled on this issue. *See* Aplt. Br. at 13, 14, 16. And, as we have explained above, even if it were not a ruling, a district court's failure to decide whether absolute immunity applies after defendants have raised the defense is an "effective denial

---

[6] The Detectives do not argue we have pendent appellate jurisdiction over any of these claims, Aplt. Reply at 4, so we do not consider that question.

of complete immunity" that is immediately appealable. *Paine v. City of Lompoc*, 265 F.3d 975, 981 (9th Cir. 2001); *see Lowe*, 143 F.3d at 1380 (district court's failure to decide qualified immunity issue is immediately appealable).

### B. Malicious Prosecution

Turning to the merits, we begin with Montoya's malicious prosecution claim. Since the Detectives have asserted qualified immunity, Montoya "bears a heavy two-part burden to show, first, that the defendant's actions violated a constitutional or statutory right, and, second, that the right was clearly established at the time of the conduct at issue." *See Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks and citations omitted). The Detectives contend they are entitled to qualified immunity because Montoya has failed to state a claim for malicious prosecution, and has therefore failed to show their "actions violated a constitutional or statutory right." We review this question de novo, accepting all well-pleaded factual allegations in the complaint as true and viewing them in the light most favorable to Montoya. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

To state a § 1983 claim for malicious prosecution, a plaintiff must show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the

-18-

defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

The Detectives have only challenged the second element. They claim Montoya cannot show the criminal proceedings terminated in his favor.[7]

To meet this second element, the plaintiff has the "burden to show that the termination was favorable." *Cordova v. City of Albuquerque*, 816 F.3d 645, 650 (10th Cir. 2016). To carry that burden, a plaintiff must allege facts which, if true, would allow a reasonable jury to find the proceedings terminated "for reasons indicative of innocence." *See M.G. v. Young*, 826 F.3d 1259, 1263 (10th Cir. 2016).

An acquittal due to innocence is, of course, the gold standard for showing proceedings terminated in the plaintiff's favor. And a plaintiff obviously meets the element if a court vacated the conviction because the plaintiff was "factually innocent." *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004). But when criminal proceedings terminate some other way, it is less obvious whether or not

---

[7] One note of clarification: there are two termination requirements relevant to a § 1983 malicious prosecution claim. One is the favorable termination requirement that is an element of the malicious prosecution claim itself. The other is the *Heck v. Humphrey* rule that a litigant cannot bring a § 1983 claim challenging a conviction's legitimacy until that conviction has been dismissed. 512 U.S. 477, 486–87 (1994). Only the first termination requirement is at issue here; Montoya meets the *Heck* requirement because the conviction he attacks has been dismissed. *See Butler v. Compton*, 482 F.3d 1277, 1278–80 (10th Cir. 2007).

the termination demonstrates innocence. *See Cordova*, 816 F.3d at 654. In fact, many times the disposition terminating a criminal proceeding does not on its face say anything at all about the plaintiff's guilt. In those cases, we "look to the stated reasons for the dismissal as well as to the circumstances surrounding it in an attempt to determine whether the dismissal indicates the accused's innocence." *Wilkins*, 528 F.3d at 803. If, in view of the circumstances, "the case [was] disposed of in a manner that leaves the question of the accused's innocence unresolved, there generally can be no malicious prosecution claim by the accused." *Young*, 826 F.3d at 1262 (quotation omitted). Put another way, if, under the circumstances, the termination of proceedings "does not touch the merits," the criminal proceedings did not terminate favorably. *Cordova*, 816 F.3d at 651 (quoting Dan B. Dobbs et al., Dobb's Law of Torts § 590 (2d ed.2015)).

Even though we look at the totality of the circumstances, our cases have identified certain kinds of dispositions that usually do not indicate innocence. We have said, for example, that a plaintiff's innocence is usually not sufficiently clear-cut when the prosecution abandons proceedings "pursuant to an agreement of compromise" or "out of mercy requested or accepted by the accused." *Young*, 826 F.3d at 1262; *Wilkins*, 528 F.3d at 803. So too when a court dismisses a charge on "technical grounds having little or no relation to the accused's guilt," when the state abandoned proceedings because of the accused's misconduct, or when new proceedings for the same offense have not terminated in favor of the

accused. *Young*, 826 F.3d at 1262; *Wilkins*, 528 F.3d at 803 & n.9.

In this case, the prosecution agreed to vacate Montoya's conviction as a compromise after Montoya filed a petition for relief due to ineffective assistance of counsel and actual innocence. Montoya argues this vacatur sufficiently demonstrates his innocence, and thus claims the criminal proceedings terminated in his favor. Looking to the prosecution's stated reasons, as well as to the surrounding circumstances, we conclude Montoya has failed to allege a favorable termination. Accepting the facts Montoya alleges as true and construing them in his favor, the question of Montoya's innocence was left "unresolved" by the vacatur of his prior conviction. *See Young*, 826 F.3d at 1262 (quotation omitted).[8]

To begin, the prosecution's stated reasons for the vacatur did not indicate Montoya's innocence. At the June 2014 hearing, the government expressly stated that the primary reason it compromised was it thought Montoya's ineffective assistance of counsel claim had some chance of succeeding—that the proceeding "would have been very close." App. 94. In addition, the prosecution explained that in "discussions with police officers, prior DAs, the elected DA, and the victim's family, everyone to a person thought that Mr. Montoya should have taken" a plea deal offered to him before trial. *Id.* For that reason, the prosecution

---

[8] In considering Montoya's allegations, we may consider the transcripts of the proceeding in which the prosecution agreed to dismiss his conviction. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

believed the deal was "in the interest of justice." App. 94.

These statements are not an admission of Montoya's innocence. Nor can they be fairly read as a concession that "the case could not be proven beyond a reasonable doubt." *Wilkins*, 528 F.3d at 803. The prosecution, in fact, could not have made clearer the limited nature of its concession: "so the fact that I am conceding that defense counsel was ineffective," the prosecution explained, "was only for the purposes of effecting this plea." App. 94. Indeed, Montoya's own complaint explains that even after the compromise, the District Attorney repeatedly asserted Montoya was actually guilty. App. 768 ¶ 171. And the state continues to argue Montoya's guilt before this court. The prosecution's stated reasons for vacating Montoya's conviction therefore do not indicate his innocence.

Turning to the surrounding circumstances, these too reveal the vacatur did not indicate Montoya's innocence. First, the disposition here falls squarely within those categories of dispositions that typically fail to show innocence. The prosecution specified that part of its motivation for vacating the conviction was the plea for mercy on behalf of the victim's family. Even more importantly, the vacatur of Montoya's conviction was explicitly and unequivocally a compromise: the prosecution conceded that Montoya's trial attorney had been ineffective and agreed to vacate his convictions in exchange for Montoya's guilty plea to a charge of accessory after the fact. In the words of Montoya's own counsel, the

-22-

prosecution made a "concession . . . contingent on the plea." App. 95. As already explained, both of these facts make the termination of proceedings in this case the kind that ordinarily does not constitute a favorable termination. *See Young*, 826 F.3d at 1262; *Wilkins*, 528 F.3d at 802–03.[9]

Second, the state court itself noted "the issue [of] whether or not the Court would . . . have granted [Montoya relief] was a toss-up or a horse race." App. 95. If the state court itself characterized the resolution of Montoya's petition for relief as a "toss-up," it is far less likely the ensuing compromise indicates Montoya's innocence.

Third, as part of the compromise, Montoya admitted wrongdoing. In exchange for vacating his murder conviction, Montoya pleaded guilty to "unlawfully and feloniously render[ing] assistance to Nicholas Martinez with intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of Nicholas Martinez for the commission of a crime, knowing that person had committed the crime of murder." App. 98. It

---

[9] Indeed, many courts hold compromises can never constitute a favorable termination. *See, e.g.*, Dan B. Dobbs, et al., *The Law of Torts* § 590 (2d ed.) ("When the criminal prosecution is terminated . . . because of a compromise settlement . . . courts have held that the termination is not favorable to the accused . . . ."); Restatement (Second) of Torts § 660 (1977) ("termination of criminal proceedings in favor of the accused other than by acquittal *is not a sufficient termination* to meet the requirements of a cause of action for malicious prosecution if . . . the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused" (emphasis added)).

is true this is not the same as admitting guilt for the earlier crimes of conviction—namely, felony murder, robbery, and burglary. But Montoya still admitted guilt for a crime that was *related* to the earlier crimes of conviction. This fact makes the termination of proceedings here seem less like a vindication of Montoya's innocence, and more like a settlement that says very little about Montoya's guilt.

Together, these circumstances show the vacatur of Montoya's conviction did not resolve the question of his guilt or innocence with respect to the crimes of conviction. To be sure, at the time of the compromise, the prosecution was in possession of new evidence which increased the likelihood Montoya was not at the murder scene. And this, in turn, would have made it difficult for the prosecution to retry him in the event his petition for relief succeeded.

But the fact the prosecution was aware of new evidence at the time of the compromise is not enough to show that the compromise resolved the question of Montoya's guilt in his favor. None of Montoya's arguments undermines our analysis above—namely, the fact the prosecution's stated reasons for compromise were unrelated to innocence, the state court's statement that it thought Montoya's petition was a "toss-up," the government's continued insistence that Montoya was actually guilty[10], and Montoya's admission of guilt for a related crime. Looking

_____

[10] In addition to general denials of Montoya's innocence after the
(continued...)

at all the circumstances, the compromise in this case did not resolve the question of guilt in Montoya's favor.

Since Montoya has failed to allege a favorable termination as a matter of law, Montoya cannot state a claim for malicious prosecution, and the Detectives are entitled to qualified immunity.

## C. Fifth Amendment Claim

The Detectives next argue that both absolute testimonial immunity and qualified immunity bar Montoya's Fifth Amendment claim. We begin with the Detectives' assertion of absolute testimonial immunity. Again, our review is de novo. *Brown*, 662 F.3d at 1162; *Perez v. Ellington*, 421 F.3d 1128, 1133 (10th Cir. 2005).

### 1. Absolute Testimonial Immunity

As the Supreme Court has interpreted § 1983, various prosecutorial or trial "functions . . . are absolutely immune from liability for damages under § 1983." *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012). One of these protected functions is "the giving of testimony by witnesses at trial." *Id.* The Supreme Court has defined this immunity broadly, explaining that "a trial witness has absolute immunity with respect to *any* claim based on the witness' testimony." *Id.* at 367

---

[10](...continued)
compromise, Montoya alleges the District Attorney said "they *always* knew [Montoya] was the 'lookout.'" App. 768 ¶ 171–72.

(emphasis in original). It therefore falls to us to decide whether Montoya's Fifth Amendment claim is "based on" trial testimony.

At first glance, the question appears a simple one. The Fifth Amendment provides that "No person . . . shall be compelled *in any criminal case* to be a witness against himself." U.S. Const. amend. V. (emphasis added). In line with the Amendment's text, courts have held the government only violates the Fifth Amendment if it uses coerced statements "in a criminal case." *See Chavez v. Martinez*, 538 U.S. 760, 766–67 (2003) (plurality); *Koch v. City of Del City*, 660 F.3d 1228, 1245 (10th Cir. 2011). To state a claim that the government violated his Fifth Amendment right, then, Montoya must show his coerced admissions were actually used against him in a criminal proceeding. That is to say, the use of incriminating statements in a criminal proceeding is *an element* of Montoya's claim. And since Montoya alleges the government used his coerced statements against him through Detective Vigil's trial testimony, it seems obvious his claim is "based on" testimony.

Indeed, some circuits would hold as much. In their view, if the plaintiff must use trial testimony to prove *any* element of his or her claim, the claim is surely "based on" testimony under the meaning of *Rehberg*.[11] This approach is

---

[11] *See Sanders v. Jones*, 845 F.3d 721, 730 (6th Cir. 2017), *as amended on denial of reh'g* (Mar. 20, 2017), *cert. granted, judgment vacated on other grounds*, 138 S. Ct. 640 (2018) ("[T]he question is whether false grand jury

(continued...)

-26-

consistent with the Supreme Court's broad definition of absolute testimonial immunity in *Rehberg*.[12]

Yet Montoya is not necessarily seeking to hold Detective Vigil liable *for his testimony*, but rather for the unconstitutionally coercive interrogation that happened much before. Had his coerced statements been introduced in some other way—say, through a videotape—Montoya would make exactly the same claim against the Detectives. And, Montoya emphasizes, as broad as *Rehberg*'s language was, the Supreme Court disclaimed any approach that would allow absolute testimonial immunity too broad a reach: "we do not suggest," the Court

---

[11](...continued)
testimony is a prerequisite for any element of [the plaintiff's] claim."); *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) ("When a police officer claims absolute immunity for his grand jury testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony.").

[12] Other circuits follow similar approaches, but not without some confusion and inconsistency. The Ninth Circuit looks to whether a claim is "inextricably tied" to testimony, but has held that immunity for testimony introducing fabricated evidence does not extend to the act of fabrication. *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1241, 1243 (9th Cir. 2015). The Eleventh Circuit asks if the plaintiff's claims are "supportable . . . only by consideration of the actual contents of [the officer's] allegedly perjured testimony." *Mastroianni v. Bowers*, 173 F.3d 1363, 1367 (11th Cir. 1999). The Seventh Circuit's take is somewhat more difficult to decipher. It has suggested absolute testimonial immunity would bar claims for the use of coerced statements at trial, *see Whitlock v. Brueggemann*, 682 F.3d 567, 584 (7th Cir. 2012); *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994), but that evidence fabrication would not be so barred, *Whitlock*, 682 F.3d at 584–85; *Manning v. Miller*, 355 F.3d 1028, 1031–33 (7th Cir. 2004).

there said, "that absolute immunity extends to *all* activity that a witness conducts outside of [trial]." 566 U.S. at 370 n.1 (emphasis in original). Indeed, the Court noted, "law enforcement officials who falsify affidavits and fabricate evidence" receive only qualified immunity—even if they are also witnesses. *Id.* (citations omitted).

Montoya thus suggests a claim is only "based on" testimony when it depends on the wrongfulness of the testimony at trial, and not simply on the fact the testimony existed. After all, the Supreme Court has admonished that absolute immunity should apply sparingly. *See Burns v. Reed*, 500 U.S. 478, 486–87 (1991); *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993). And it would be bizarre to allow officers to immunize their prior misdeeds by testifying. *See Avery v. City of Milwaukee*, 847 F.3d 433, 441 (7th Cir.), *cert. denied sub nom. Hernandez v. Avery*, 137 S. Ct. 2249 (2017).

We have suggested the same once before. In *Vogt v. City of Hays*, 844 F.3d 1235 (10th Cir. 2017),[13] Matthew Vogt voluntarily disclosed to a prospective employer that he had kept a knife obtained in the course of his work as a police officer for the City of Hays. *Id.* at 1238. At the prospective employer's insistence, Vogt reported this to the Hays police department, and the Hays police

_____

[13] The Supreme Court granted certiorari on *Vogt*, *see City of Hays v. Vogt*, 138 S. Ct. 55 (2017), but ultimately dismissed the case as improvidently granted, *see City of Hays v. Vogt*, No. 16-1495, 2018 WL 2402553 (U.S. May 29, 2018).

-28-

chief ordered Vogt to submit a written report explaining the incident. *Id.* Eventually, the Hays police department's investigation led the State of Kansas to bring charges against Vogt, and the state used Vogt's statements against him at the probable cause hearing. *Id.* Vogt sued a number of individuals and entities, including the City of Hays. He claimed the Hays police chief had coerced him into making incriminating statements, and so the prosecution's use of those statements at the probable cause hearing violated his Fifth Amendment rights. *Id.*

This court held Vogt had stated a valid Fifth Amendment claim against the City of Hays. *Id.* at 1249–50. In so deciding, we rejected a number of Hays's defenses, including—as relevant here—its invocation of absolute testimonial immunity. In a footnote, we explained: "Hays also argues that . . . witnesses in criminal proceedings enjoy absolute immunity from civil liability arising out of their testimony." *Id.* at 1250 n.11. "But," we continued, "Mr. Vogt [did] not allege that the defendants acted unlawfully *by testifying*," but rather that "Hays unconstitutionally compelled him to incriminate himself." *Id.* (emphasis added). We concluded that "*[t]hough the use of those statements . . . would complete the alleged Fifth Amendment violation*, the act of testifying does not serve as the basis of Mr. Vogt's claims." *Id.* (emphasis added). In other words, *Vogt* supports Montoya's distinction between testimony that merely completes a violation and testimony that forms the basis of the wrongful conduct complained of.

-29-

But even if Montoya is correct about this distinction, we conclude absolute testimonial immunity bars his claim. Unlike Vogt, who did "not allege that the defendants acted unlawfully by testifying," *id.*, Montoya's claim depends on showing Detective Vigil *did* act unlawfully by testifying. There is a simple reason for this: the trial court suppressed all testimony about the part of the interrogation Montoya claims was unconstitutionally coercive. Thus, in order to show Detective Vigil introduced his coerced statements at trial, Montoya must show Detective Vigil violated the suppression order—that he acted wrongfully by testifying. Put differently, Montoya is not complaining the Detectives coerced his confession and that his statements happened to be used against him through trial testimony as opposed to some other means; he is claiming both that they coerced his confession *and* that Detective Vigil unlawfully introduced his statements by disobeying the suppression order. Shielding witnesses from claims their testimony was unlawful is precisely what absolute testimonial immunity is meant to do.

We conclude, then, that Montoya's Fifth Amendment claim is "based on" trial testimony and is barred by absolute immunity.[14]

_____

[14] Although Montoya also alleged his statements were used at other points in the proceedings against him, he only argues the statements' use at *trial* violated his clearly established Fifth Amendment rights. Even if he had argued that other uses of his statements violated the Fifth Amendment, though, he likely would not have prevailed. We recently held that in 2013, it was not clearly established that

(continued...)

## 2. *Qualified Immunity*

Even if absolute immunity did not apply, the Detectives are also entitled to qualified immunity on Montoya's Fifth Amendment claim. Once again, the Detectives argue they are entitled to qualified immunity because Montoya cannot state a claim, and therefore cannot show they violated a constitutional right. *See Thomas*, 765 F.3d at 1194.

As already mentioned, to state a Fifth Amendment claim, Montoya must allege the government used his coerced statements against him in a criminal proceeding. *See Chavez*, 538 U.S. at 766–67. Accordingly, Montoya's complaint states that his "coerced statements were the contributing factor to his conviction at trial." App. 788 ¶ 281.

After carefully reviewing Montoya's complaint, however, we conclude Montoya's allegations fail to state a Fifth Amendment claim. Put most simply, Montoya himself alleges the statements Detective Vigil recounted at trial *were not in fact what Montoya said during his interrogation.* Montoya's amended complaint states that "Vigil testified at trial about [his] interrogation" and that "Vigil referenced parts of [his] interrogation that were suppressed by the Court." App. 765 ¶¶ 149, 151. And after this, Montoya lists two excerpts from Detective

---

[14](...continued)
using coerced statements at a probable cause hearing would violate the Fifth Amendment. *Vogt*, 844 F.3d at 1248. The same would clearly be true in 2000.

Vigil's testimony—presumably the statements he just referred to. But then Montoya claims that this "testimony was false" because Montoya "never said" those things "during his interrogation." *Id.* at 765–66 ¶¶ 150, 153, 155. "Vigil's testimony," Montoya alleges, "contained false and misleading statements about the substance of the interrogation." *Id.* ¶ 150. In fact, "[*n*]*one of these statements that Vigil attributed to* [*Montoya*] actually came from the interrogation itself." *Id.* ¶ 155 (emphasis added).

If "none" of the statements Detective Vigil attributed to Montoya came from the interrogation, then Montoya's allegedly coerced statements were not used against him. Montoya is instead complaining of perjury.

Because Montoya has not adequately alleged the government used his coerced statements against him in his criminal proceeding, he cannot state a Fifth Amendment claim. As a result, qualified immunity immunizes the Detectives from this claim.[15]

## III. Conclusion

We therefore **DISMISS** the Detectives' appeal on the false arrest claim for lack of jurisdiction, **REVERSE** the district court's denial of qualified immunity

---

[15] Given our resolution of these issues, we find it unnecessary to address whether the Detectives' interrogation tactics were actually coercive under clearly established law.

on Montoya's malicious prosecution, and **REVERSE** the district court's denial of both absolute and qualified immunity on the Fifth Amendment claim.