# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3454

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Eastern District of Missouri. |
| Mario Darnell Smith, | * |
| | * |
| Appellant. | * |

_____

Submitted: April 12, 2011
Filed: August 5, 2011

_____

Before RILEY, Chief Judge, BENTON and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

Mario Darnell Smith conditionally pled guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Smith reserved the right to appeal the district court's[1] denial of his motions to suppress evidence seized from his vehicle. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri, adopting the recommendation of the Honorable Frederick R. Buckles, United States Magistrate Judge for the Eastern District of Missouri.

## I.    BACKGROUND

On April 10, 2009, at approximately 5:39 p.m., an unidentified masked man jumped over the front counter at a U.S. Bank branch in St. Louis County, Missouri, and demanded money from the tellers. Witnesses described the masked robber as a black male wearing a red jacket and a white cap. As the robber fled on foot, he left a trail of money leading to a nearby apartment complex.

During the investigation of the robbery, Detective Robert Vogel of the St. Louis County Police Department obtained surveillance video from the apartment complex that showed a man matching the description of the robber arriving at the apartment complex in a burgundy Buick shortly before the robbery. A white Cadillac followed the Buick into the lot and parked nearby. The man exited the driver's side of the Buick and got in the passenger side of the Cadillac. The Cadillac then drove toward the bank.

A few minutes later, after the robbery, a man in a red jacket and white cap climbed a fence at the apartment complex and entered the Buick. As police cars drove past the parked Buick, the suspect removed his jacket. Moments later, the suspect exited the Buick wearing different clothing and entered the apartment complex.

With license plate information obtained from the surveillance video, Detective Vogel located the registered owners of both vehicles. The registered owner of the white Cadillac, a former girlfriend of Smith's, told investigating officers that Smith was the actual owner of the vehicle and that she did the paperwork for him. Licensing records also showed Smith received several traffic tickets while driving the Cadillac. The owner of the Buick, Sahid Lewis, advised officers that he saw a man named Mario driving the white Cadillac in a White Castle parking lot across the street from the bank immediately before the robbery. Lewis admitted he drove his Buick from White Castle to the apartment complex the day of the robbery, but denied any involvement in the crime.

On April 12, 2009, Detective Vogel issued a wanted[2] for the white Cadillac in connection with the felony robbery investigation. The wanted described the white Cadillac, including its license plate number, gave a general description of the suspect, and requested law enforcement officers hold the vehicle for prints and field interview any passengers. Detective Vogel also described the Cadillac and its connection to the robbery to Officer Jason West of the Florissant Police Department (FPD) and asked him to watch for the vehicle.

On April 14, 2009, Detective Vogel issued a wanted for Smith in connection with the robbery investigation. The wanted for Smith included identifying information and requested that officers "Hold 24 Per Det Vogel." Detective Vogel testified he could not locate Smith to talk to him and that issuing a wanted was a "helpful way to find people." Detective Vogel did not seek judicial authorization before issuing the wanteds.

On April 15, 2009, at approximately 1:00 a.m., Officer Patrick O'Neill of the FPD searched the license plate number of a light-colored Cadillac traveling southbound on U.S. Highway 67. Officer O'Neill called for assistance after verifying the Cadillac was wanted for possible involvement in an armed robbery. When the Cadillac turned into a Taco Bell parking lot, Officer O'Neill, who was in a marked police vehicle, activated his emergency lights and attempted to stop the Cadillac. Other officers arrived shortly thereafter and also activated their lights.

When the Cadillac stopped, the officers exited their vehicles with weapons drawn. Through the Cadillac's open window, the officers told the driver (later identified as Smith) to turn off the engine and throw the keys on the ground. Smith did not comply. Smith stuck his head through the open window and said, "What do you

---

[2]Detective Vogel described a "wanted" as an investigative tool that allows law enforcement to gather information or evidence of a crime and locate people who might have such information or evidence and possibly take them into custody.

want?" Smith then opened the door and it appeared to Officer O'Neill that Smith was about to step out. Instead, Smith closed the door, removed his foot from the brake and slowly drove toward the back of the parking lot through the drive-through lane, which the officers interpreted as an attempt to find an escape route.

Officer West, who was helping with the stop, drove his patrol car into the drive-through lane, blocking the Cadillac's only avenue of escape. Smith stopped the Cadillac and exited the vehicle. The officers holstered their weapons and approached Smith. Ignoring the officers' instructions to show his hands and get down on his knees, Smith moved toward the rear of the Cadillac. About the time Smith began to run, Officer West deployed his taser without effect. Smith soon reached "full stride."

As Smith fled the Taco Bell lot through a back gate into an open field, Officers O'Neill, West and Easton chased him on foot. Officer West broke off his chase and returned to the Taco Bell to secure the patrol cars and the Cadillac. Officer West turned the Cadillac off in case Smith returned, but did not close the open car door.

After a foot chase through a residential neighborhood, Officers O'Neill and Easton caught up to Smith and ordered him to stop. When Officer O'Neill attempted to restrain Smith, Smith fought the officers and tried to bite Officer O'Neill's hand. Despite Smith's resistence, the officers eventually handcuffed him and placed him in a patrol car. The officers arrested Smith for assaulting a law enforcement officer and resisting arrest.

Searching Smith incident to the arrest, officers discovered a Missouri driver's license for "Mario Smith" and $4,298.56 in cash. Officer West notified Detective Vogel the officers had located the wanted Cadillac. Detective Vogel and a crime-scene detective responded and searched the Cadillac for evidence of the armed robbery. The search yielded $72,900 in cash and a Glock model 20, 10mm handgun.

On April 16, 2009, a grand jury charged Smith with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Smith moved to suppress the evidence obtained from his arrest and the search of the Cadillac. The magistrate judge conducted two suppression hearings, issuing a report and recommendation after each hearing. The magistrate judge recommended denying Smith's motions to suppress because (1) the officers' initial stop and detention of Smith was a "lawful investigatory detention" under Terry v. Ohio, 392 U.S. 1 (1968), (2) the information known to the officers provided probable cause for Smith's arrest, and (3) Smith abandoned the Cadillac when he fled the scene. After de novo review, the district court adopted the magistrate judge's recommendation and denied Smith's motions to suppress.

On August 13, 2010, Smith conditionally pled guilty to the felon-in-possession charge, reserving the right to appeal the denial of his motions to suppress. On appeal, Smith argues (1) "the district court erred in finding the stop and seizure of the white Cadillac was a justifiable Terry stop," (2) "Smith was under de facto arrest, without probable cause, from the moment of his first interaction with law enforcement," and (3) the abandonment exception did not justify the search of the Cadillac.

## II.    DISCUSSION
### A.    Standard of Review

In reviewing a denial of a motion to suppress, we review the district court's findings of fact for clear error, "giving due weight to the inferences police drew from those facts." United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010) (quoting United States v. Ramires, 307 F.3d 713, 716 (8th Cir. 2002) (internal quotation marks omitted)). We "review[] de novo the district court's legal conclusion that reasonable suspicion or probable cause existed." Id. "We will affirm the denial of a suppression motion unless we find that the decision is unsupported by the evidence, based on an erroneous view of the law, or the Court is left with a firm conviction that a mistake has been made." Id. (quoting United States v. Donnelly, 475 F.3d 946, 951 (8th Cir. 2007) (internal quotation marks omitted)). We review the district court's factual finding that

Smith abandoned the Cadillac for clear error and the district court's legal conclusion of abandonment de novo. See, e.g., United States v. James, 534 F.3d 868, 873 (8th Cir. 2008).

### B.    Reasonable Suspicion and Probable Cause

Smith contends the district court erred in denying his motions to suppress because the "actions of police officers before, during and after the initial seizure, and the testimony of police officers during the suppression hearings demonstrate that the seizure of his vehicle was an illegal, pre-planned, warrantless seizure and subsequent search, and Mr. Smith was under de facto arrest from the moment of his initial seizure by law enforcement." According to Smith, "[t]he means and scope of this detention was unreasonable in the absence of a probable cause and exigent circumstances, or a warrant." We disagree.

"The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity." United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007). In such a case, "officer[s] may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion." United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008).

"Reasonable suspicion requires 'that the [officers'] suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime [has been] committed.'" United States v. Lopez-Mendoza, 601 F.3d 861, 865 (8th Cir. 2010) (quoting United States v. Jones, 269 F.3d 919, 927 (8th Cir. 2001)). We determine whether such facts and inferences support a reasonable suspicion of criminal activity based on "the totality of the circumstances." Bell, 480 F.3d at 863 (quoting United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005) (internal quotation marks omitted)).

Police officers may rely upon notice from another police department that a person or vehicle is wanted in connection with the investigation of a felony "when making a Terry stop, even if the [notice] omits the specific articulable facts supporting reasonable suspicion." United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004) (citing United States v. Hensley, 469 U.S. 221, 232 (1985)). "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." Hensley, 469 U.S. at 232 (internal citations omitted).

"A Terry stop may become an arrest, requiring probable cause, 'if the stop lasts for an unreasonably long time or if officers use unreasonable force.'" Newell, 596 F.3d at 879 (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)). "[A]s part of a lawful Terry stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" Id. (quoting Hensley, 469 U.S. at 235). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004). See United States v. Danielson, 728 F.2d 1143, 1146-47 (8th Cir. 1984) (concluding investigatory detention did not become an arrest when the officers drew their weapons before approaching the vehicle occupied by suspected armed bank robbers).

Applying these principles to this appeal, we agree with the district court that under the totality of the circumstances, the officers' reasonable suspicion of a connection between Smith and his Cadillac and the bank robbery warranted an investigatory detention. The reasonable safety measures officers took in effecting an inherently dangerous investigative stop in connection with an armed robbery did not

transform the encounter with Smith into an arrest. Detective Vogel's investigation indicated Smith was the owner and primary user of the white Cadillac seen on the surveillance video picking up a man matching the description of the bank robber and driving toward the bank moments before the robbery. A witness placed Smith behind the wheel of the Cadillac a few blocks away from the bank shortly before the robbery occurred.

Those particularized, objective facts and the inferences rationally drawn from them justified Officer O'Neill stopping the Cadillac and detaining Smith to determine if the Cadillac or Smith were involved in the bank robbery or could provide information helpful to the investigation. Because the officers were investigating an armed robbery, it was reasonable for them to approach the Cadillac with weapons drawn and to ask Smith to exit the vehicle. Smith escalated the encounter by refusing to comply with the officers' instructions and then fleeing. Smith's flight and resulting fight with the officers, combined with the information supporting the stop, gave officers probable cause to arrest Smith.[3] Because Smith's detention and arrest were valid under the Fourth Amendment, the district court did not err in denying Smith's motions to suppress.

### C.    Abandonment

We also reject Smith's assertion the district court clearly erred in finding Smith abandoned the Cadillac in the Taco Bell drive-through lane when he fled on foot. "A

---

[3]Although the government suggests "the investigating officers not only had reasonable suspicion to support the <u>Terry</u> stop, but also had probable cause to effect the arrest" at the time Officer O'Neill stopped the Cadillac, the government concedes the issue is moot because "the district court found the stop justifiable under <u>Terry</u> and Smith's actions subsequent to the stop provided abundant probable cause for his arrest." In addition, beyond abandonment, the government does not raise, and we do not consider, whether any other exception to the warrant requirement applies to the search of the Cadillac.

warrantless search of abandoned property does not implicate the Fourth Amendment, [because] any expectation of privacy in the item searched is forfeited upon its abandonment." James, 534 F.3d at 873 (quoting United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997)). "The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished [his] reasonable expectation of privacy so that the search and seizure is valid." United States v. Hoey, 983 F.2d 890, 892-93 (8th Cir. 1993).

In a factually similar case, we held the warrantless search of a suspected bank robber's vehicle, left parked on a public street, unlocked, with the windows down as the robber fled the police, did not violate any Fourth Amendment right of the suspected bank robber. See United States v. Walton, 538 F.2d 1348, 1351, 1354 (8th Cir. 1976). See also United States v. Vasquez, 635 F.3d 889, 892, 894 (7th Cir. 2011) (concluding defendant had no expectation of privacy in his vehicle after fleeing from police and abandoning the vehicle in a Wal-Mart parking lot before continuing his flight on foot); United States v. Edwards, 441 F.2d 749, 751 (5th Cir. 1971) ("Defendant's right to Fourth Amendment protection came to an end when he abandoned his car to the police, on a public highway, with engine running, keys in the ignition, lights on, and fled on foot. At that point defendant could have no reasonable expectation of privacy with respect to his automobile.").

Relying on Walton and similar cases, the district court determined Smith abandoned the Cadillac "when he left the car open, with the keys in the ignition, the motor running, in a public area" and then ran from the police. Based on the totality of the circumstances, the district court did not err in concluding Smith relinquished any legitimate expectation of privacy he might have had in the Cadillac and its contents. As such, the district court properly denied Smith's motions to suppress.

III.   CONCLUSION
       We affirm.

_____