**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 20, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

MANUEL CHAVEZ,

     Defendant - Appellant.

No. 19-2123

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:18-CR-00461-JAP-1)**
_____

William D. Lunn of William D. Lunn Attorney at Law, Tulsa, Oklahoma (Shammara H. Henderson of Freedman Boyd Hollander Goldberg Urias & Ward, Albuquerque, New Mexico, with him on the brief), for Defendant-Appellant.

Dustin C. Segovia, Assistant United States Attorney (John C. Anderson, United States Attorney, with him on the brief), Las Cruces, New Mexico, for Plaintiff-Appellee.
_____

Before **PHILLIPS**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

We must decide whether a deputy sheriff's warrantless seizure of a firearm from a car was reasonable under the Fourth Amendment. Before the seizure, the driver, Manuel Chavez, had driven the car at least a couple hundred feet up a private,

dirt roadway and parked it outside his isolated trailer home. In a thorough order, the district court approved just one of the government's asserted justifications for the seizure of the firearm (a .38 special caliber Amadeo Rossi S.A.). It ruled that the deputy's seizure of the firearm was reasonable as part of an inventory of the car's contents in preparation for impounding it. But during the inventory, a woman emerged from the trailer and satisfied the deputy that she owned the car. So the deputy left the car with her where it was parked, mere feet from her and the defendant's trailer, but the deputy kept the firearm.

In denying an ensuing motion to suppress, the district court held that the deputy could lawfully seize and keep the firearm, even without admissible evidence that anyone had illegally possessed or used it. The court did not evaluate whether it mattered that the deputy never in fact impounded the car. We reject the district court's denying the motion to suppress on inventory-impoundment grounds. Further, we reject all the government's other asserted bases to validate the deputy's seizing and keeping the firearm. We hold that the district court erred by denying the motion to suppress, so we reverse.

## I.   BACKGROUND

### A.   Factual Background

On January 8, 2018, soon after midnight, Deputy Sheriff Eric Castañeda saw a car run a stop sign in Albuquerque, New Mexico. After catching up to the car, Deputy Castañeda activated his patrol lights as a signal for the car to pull over. With the deputy behind him, the driver slowly made his way to a nearby gas station. The

driver parked near a gas pump, and the deputy parked behind him. As the deputy approached on foot, he noticed that the driver—later identified as Manuel Chavez[1]—was a Hispanic male wearing a camouflage jacket, a red-and-white beanie, jewelry around his neck, and an earring in his left ear. The deputy also noticed a small brown-and-white dog moving around inside the car.

The deputy further noticed that Mr. Chavez was steadily gazing at him in the car's mirrors, and he saw Mr. Chavez roll his shoulder forward as if reaching for something under his car seat. Concerned for his safety, the deputy proceeded slowly, pausing momentarily after reaching the car and touching its trunk. Taking his hand off the trunk, he unfastened his holster and placed his hand on his gun, preparing to draw it if necessary. After the deputy took another step or two, Mr. Chavez sped away.

During the ensuing pursuit, Mr. Chavez ran another red light, exceeded the speed limit, and risked colliding with an ambulance by swerving lanes. The deputy again activated his patrol lights. Though the deputy temporarily lost sight of the car, he soon saw dust hovering above an intersecting dirt road and turned down it.

The dirt road ran about 200 or 300 feet. At its end, the deputy saw, through more raised dust, a trailer, an RV, and the same car with its headlights and taillights shining in the darkness. The car was sitting a few feet from the trailer. The area around the dirt road and the trailer was open property, full of tumbleweeds and tall,

---

[1] Because this case involves two men named "Chavez," we refer to Manuel Chavez as Mr. Chavez and Deputy Leroy Chavez as Deputy Chavez.

dried brush. The deputy saw "a lot of opportunity for someone to hide around those places." R. vol. 1 at 146. The dirt roadway had no streetlights.

The deputy exited his patrol car with his gun drawn, and after letting the dust settle some, approached the car. Using his gun light, he saw that the driver was gone but that the dog remained inside the car. The deputy then called for backup assistance. Within three minutes, other deputies and officers arrived and began setting up a perimeter.

One responding officer, Deputy Leroy Chavez, noticed that the car's "engine was still running" and that its RPMs were "fluctuating." *Id.* at 235, 242. He also saw that the car was in the drive gear and that it had a "slight rock to it" from idling. *Id.* at 245, 248. As he approached, he confirmed that the car had no occupants except for the dog. With officers standing in front of the car, and the unrestrained dog inside, Deputy Chavez worried that the car might move forward. For safety's sake, he opened the unlocked driver's side door, balanced himself on the steering wheel with his left hand, put his right foot on the brake, and shifted the vehicle into park with his right hand. As he pushed back out of the car, he saw on the driver-side floorboard a "rubber grip which appeared to be a handgun in a black holster." *Id.* at 253–54. Leaving the firearm in place, he shut the door.

Meanwhile, a man emerged from the RV and asked what was going on. Deputy Castañeda told him why the officers were there. The man gave helpful information. He told the deputy that the car belonged to the man and woman who lived in the trailer but that he did not know their names. He also recognized the dog

4

inside the car as one "usually here in the yard." Manuel Chavez Belt-Tape Recording Part 1 Ex. 2, at 1:49–1:55.

After this encounter, Deputy Castañeda heard another deputy yell several commands from a corner of the property. That deputy had found a man lying face down in a large pit. Deputy Castañeda soon identified the man as the driver of the car. About this time, Deputy Chavez sidled up to Deputy Castañeda and told him about the firearm he had seen inside the car by the "driver's seat." *Id.* at 8:34–40. Without giving Mr. Chavez a *Miranda* warning, Deputy Castañeda asked him, "Are you a felon?" *Id.* at 8:40–8:41. Mr. Chavez responded, "Yes, sir." *Id.* at 8:41–8:42.

After arresting Mr. Chavez, Deputy Castañeda began walking him to the patrol car. On the way, the two men approached the car that Mr. Chavez had driven. As they were alongside it, Deputy Castañeda peered through the driver's side window and saw the firearm "kind of tucked in . . . underneath the seat and outside on the floorboard." R. vol. 1 at 159. Back in his patrol car, Deputy Castañeda ran Mr. Chavez's licensing information through a law-enforcement database. This revealed that Mr. Chavez had been arrested several times and was driving with a suspended driver's license. So Deputy Castañeda decided to inventory the car and have it towed and impounded.

A Deputy Heredia began inventorying and photographing the car's contents. After she photographed the firearm, Deputy Castañeda took it and secured it in his patrol car. When the officers were "pretty much already done with the inventory prior to tow," a female ("C.B.") appeared from the trailer and claimed to own the car. *Id.* at

161. After verifying her ownership, Deputy Castañeda released the car to her. The deputy learned from C.B. that she and Mr. Chavez were in a relationship and that he sometimes used her car. When asked about the firearm inside her car, C.B. denied knowing about it or owning it. Deputy Castañeda kept the firearm and it was tagged into evidence. He testified that he "wasn't just going to hand the gun out to someone, and the gun couldn't stay in the car if it was going to get released to her."[2] *Id.* at 163.

Soon after this, Deputy Castañeda took Mr. Chavez to the South Valley Command Center, where he accessed the National Crime Information Center database. From that, he confirmed Mr. Chavez's felon status and that no one had reported the firearm as stolen.

## B.     Procedural History

A federal grand jury indicted Mr. Chavez on a single count: felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Before trial, Mr. Chavez filed a motion to suppress the firearm, arguing that the officers had violated his Fourth Amendment rights by searching the car without a warrant and outside any warrant exception. He disputed the deputies' testimony that they had seen the firearm in plain view.

---

[2] The government suggests that C.B. was also a felon and thus could not have legally possessed the firearm. *See* Appellee's Answer Br. at 6 n.3 ("[C.B.] appears to be a felon."). For support, the government relies on a single leading question that the prosecutor asked Deputy Chavez at the suppression hearing: "Deputy Chavez, did you know [C.B.] was a felon?" to which the deputy responded, "I did not." R. vol. 3 at 209. This does not suffice to establish what the government now suggests regarding C.B.'s status.

After a two-day hearing, the district court denied Mr. Chavez's motion to suppress.[3] In doing so, the district court made three core rulings. First, the court ruled that Mr. Chavez had standing[4] to assert his Fourth Amendment claim. In this regard, the court rejected the government's argument that Mr. Chavez had abandoned the car by fleeing from it, with the engine running, keys in the ignition, and headlights and taillights on. In concluding that Mr. Chavez had standing, the district court relied on Mr. Chavez's having permission to drive the car and his having left it outside his residence.

Second, the court credited both deputies' accounts of seeing the firearm in plain view on the floorboard. But the district court concluded that seeing the firearm in plain view did not authorize a warrantless *seizure* of the firearm, because Mr.

---

[3] Mr. Chavez argued that metadata from the inventory photos, combined with the timestamps of the Computer-Aided Dispatch log, proved that the deputies knew that C.B. owned the car before beginning the inventory, thus undermining the officers' basis for it. The district court admitted the metadata evidence solely for the purposes of the suppression hearing but ruled that Mr. Chavez's conclusions were "speculative and based on unsupported assumptions." R. vol. 1 at 393. We agree with the district court that Mr. Chavez has "failed to establish the authenticity and reliability of the metadata." *Id.* at 328.

[4] We acknowledge the Supreme Court's "insistence that Fourth Amendment rights are personal in nature." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978) (citations omitted). Accordingly, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.* (citations omitted). Nonetheless, we address the standing inquiry as raised by the parties. *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." (citations omitted)).

Chavez's possession of the firearm gave no probable cause of a crime. For instance, rejecting one of the government's arguments to the contrary, the court ruled that Mr. Chavez's furtive movements at the service station had not established probable cause of a crime involving the firearm.

Third, the court ruled that the inventory search complied with the Fourth Amendment. According to the district court, the deputies followed "written standardized procedures, and there [was] no evidence that they acted in bad faith or for the sole purpose of investigation." R. vol. 1 at 394 (internal quotation marks and citation omitted). Though the deputies did not ultimately impound the car after verifying C.B.'s ownership, the court upheld the inventory search on grounds that the deputy had reasonably believed the car would be impounded. And from that, the district court concluded, without analysis, that the continued seizure of the handgun was also reasonable under the Fourth Amendment. On this basis, the court denied Mr. Chavez's motion to suppress.

## II.    DISCUSSION

In reviewing a district court's denial of a motion to suppress, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017) (citation omitted).

8

## A.      Fourth Amendment Standard

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, *and effects*, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). For a search or seizure to be reasonable, it must ordinarily be supported by a warrant based on probable cause. *See United States v. Ventresca*, 380 U.S. 102, 106–07 (1965) (noting that the "limited" warrant exceptions "underscore[] the preference accorded police action taken under a warrant as against searches and seizures without one" (footnote omitted)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454 (1971) (plurality opinion) (noting that "constitutional provisions for the security of person and property should be liberally construed" and that it is "the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon" (footnote omitted)).

Though "the defendant bears the burden of proving whether and when the Fourth Amendment was implicated, [t]he government then bears the burden of proving that its warrantless actions were justified [by an exception]." *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) (alterations in original) (internal quotation marks and citations omitted); 6 Wayne R. LaFave, *Search and Seizure* § 11.2(b) (6th ed., Sept. 2020 update) ("[I]f the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution." (footnote omitted)). "[W]ithout such a rule there would be little reason for law enforcement agencies to bother with

9

the formality of a warrant." LaFave, *supra*, § 11.2(b) (footnote omitted). Here, we conclude that the government's asserted bases for a warrantless seizure all fail.

**B.      Mr. Chavez Has Standing to Assert a Fourth Amendment Violation**

To bring a challenge under the Fourth Amendment, a person must have a "reasonable expectation of privacy." *United States v. Hatfield*, 333 F.3d 1189, 1195 (10th Cir. 2003) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). "[A] warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment," because "[w]hen individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) (second alteration in original) (citations omitted); *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997) ("[A] defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." (citation omitted)).

The abandonment test considers (1) whether the individual had a subjective expectation of privacy in the thing or place searched, and (2) whether the person had an objective expectation of privacy, one that society will recognize as reasonable. *See Garzon*, 119 F.3d at 1449–50. Subjective expectation is a finding of fact, which we review for clear error; objective expectation is a question of law, which we review de novo. *Id.* at 1449.

The government challenges the objective prong only, arguing that Mr. Chavez had no objective expectation of privacy "in the vehicle at the time he fled from it." Appellee's Answer Br. at 27. The district court concluded that Mr. Chavez

10

maintained an objectively reasonable expectation of privacy when he "drove the vehicle some distance from the initial traffic stop to his place of residence, leaving it only feet from the house, with the door closed, and his dog still inside." R. vol. 1 at 383. We agree. The government's cases in opposition are readily distinguishable because they involve a car being abandoned on public property.

For instance, the government relies on *United States v. Quintana-Grijalva*, in which we concluded that a driver had abandoned his car for Fourth Amendment purposes after driving it off a highway and through a barbed-wire fence and then running from the car, leaving the doors open. 332 F. App'x 487, 489–90 (10th Cir. 2009) (unpublished). Mr. Chavez's situation differs—he left the car at the end of a long private, dirt road, just outside his trailer, with doors shut and his dog still inside. The government cites no case in which our circuit has held that a defendant abandons a car in analogous circumstances.

The authority we have located relies on the car's being abandoned in a public place, not on private property outside the defendant's residence. *See, e.g.*, *United States v. Falsey*, 566 F. App'x 864, 865, 867 (11th Cir. 2014) (unpublished) (concluding that an unlocked car parked in a business parking lot with the keys inside was abandoned); *United States v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011) (concluding that a driver abandoned a car when he "left the car open, with the keys in the ignition, [and] the motor running, in a public area"); *United States v. Edwards*, 441 F.2d 749, 751 (5th Cir. 1971) ("Defendant's right to Fourth Amendment protection came to an end when he abandoned his car to the police, on a public

11

highway, with engine running, keys in the ignition, lights on, and fled on foot."). As such, we determine that Mr. Chavez had a reasonable expectation of privacy in the car and that he may thus assert a Fourth Amendment claim.

## C. The Deputies Saw the Firearm in Plain View, Before Searching the Car

At the trial court, Mr. Chavez contended that the "gun was not in plain view of anyone outside the vehicle," and that the deputies asserting otherwise were "not credible" and had an "implausible" interpretation of the facts. R. vol. 1 at 23. Despite this argument, the district court found that both deputies had seen the firearm in plain view on the driver-side floorboard. The district court's finding is not clearly erroneous. Accordingly, the government need not rely on any Fourth Amendment warrant exception for *locating* the handgun. Instead, this case turns on whether the government has shown that the deputy's seizure, and continued seizure, of the firearm was reasonable, even though he released the car to C.B. and did not impound it. We now review and reject each of the government's asserted bases in support of its argument that the continued seizure was reasonable.

## D. The Government's Theories for Affirmance Under Which It Need Not Show Probable Cause of a Crime Involving the Firearm

### 1. The Inventory Search

As mentioned, the district court denied Mr. Chavez's motion to suppress after concluding that the inventory search was lawful. But the district court's decision relies on two mistaken bases: (1) that the deputies conducted a lawful inventory search of the car; and (2) that even absent impounding the car, the lawful inventory

12

search entitled the deputy to continue to seize noncontraband items taken during the inventory. Because the deputies saw the firearm in plain view before even inventorying the car's contents, the first point is less important than it would be otherwise. But we reject the district court's conclusion on both points.

Addressing the first point, we note that "[w]hen the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'" *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 372–73 (1976)). Here, the Bernalillo County Sheriff's Office's policy *disallowed* the deputies from impounding the car from private property absent exceptions inapplicable here. By the policy's terms, "[v]ehicles will not be towed from private property unless needed as evidence, or pursuant to a lawful court order." R. vol. 1 at 65. Neither condition is met here. [5]

The district court did not reference the private-property exclusion. Instead, the district court relied on a different portion of the Bernalillo policy, one authorizing

---

[5] In fairness, we acknowledge that Mr. Chavez did not raise this policy exclusion in the district court or in his Opening Brief on appeal. Only after a change of counsel did Mr. Chavez first raise it, in his Reply Brief. Even so, the government has neither asserted waiver nor sought leave to file a surreply, despite that possibility being raised at oral argument. Because the error is obvious and satisfies Federal Rule of Criminal Procedure 52(b), we exercise our discretion to correct it, notwithstanding the briefing deficiencies. *See generally United States v. Leffler*, 942 F.3d 1192, 1197–99 (10th Cir. 2019) (discussing forfeiture, waiver, and our discretion to address waived error).

13

towing when a driver is "incapacitated, hospitalized, arrested, and/or when the vehicle cannot be released to a registered owner." *Id.* at 63. The district court found that the Bernalillo policy permitted the officers to inventory and impound the car after arresting Mr. Chavez. But because the car was on the owner's private property, the policy barred the deputy from impounding it. *See Opperman*, 428 U.S. at 372 (recognizing that "inventories pursuant to standard police procedures are reasonable"). And without a permissible reason for impounding a car, nothing justified the deputies' decision to inventory the car's contents. *Lugo*, 978 F.2d at 636 n.3 (noting that a lawful impoundment is a "prerequisite to a valid inventory search").

Addressing the second point, we note that the district court impliedly ruled that collecting the car's contents under a valid inventory search would enable the deputy to continue to seize the firearm, even after its owner claimed the car and the deputy gave up on impounding the car. The government cites no authority justifying the continued seizure of noncontraband property removed during an *invalid* inventory search, or even a valid one, after the deputy called off any impoundment.[6]

---

[6] The district court cites *United States v. Henderson*, 61 F.3d 906 (7th Cir. 1995) (unpublished table decision) as support, but this case is distinguishable. In that case, officers found and seized a firearm in a car trunk after arresting the driver on a traffic violation and inventorying the car's contents. *Id.* at *1. Though planning to tow the car, which accounted for the inventory, the driver's wife arrived and took control of the car, eliminating any need to impound it. *Id.* One difference from the present case is that the officers in *Henderson* knew that the driver was a felon and did not learn that by failing to give a *Miranda* warning and thus had sufficient probable cause to seize the weapon as contraband. *See id.* Other obvious differences are that in

## 2.      The Community-Caretaking Exception

As another basis for justifying its warrantless seizure of the firearm, the government relies on the community-caretaking doctrine. This court has recognized that some police encounters are "wholly unrelated to the desire to prosecute for crime." *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) (quoting *Terry v. Ohio,* 392 U.S. 1, 13 (1968)). Indeed, we have recognized that "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). For example, a police officer acts properly under the community-caretaking doctrine by "restraining an intoxicated individual" or by "transporting an individual to safety." *Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012) (citations omitted).

The community-caretaker exception, though not to be used as an investigatory tool, can justify seizing personal property—including automobiles. *See Neugin*, 958 F.3d at 931. The Supreme Court has noted that "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody." *Opperman*, 428 U.S. at 368 (internal citation omitted). Along this line, the Court has recognized that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.* at 369.

---

the present case, C.B.'s car was outside her trailer on private property, and she was immediately available to assume responsibility for her car.

15

The Supreme Court originally applied the community-caretaking doctrine in *Cady v. Dombrowski*, when it upheld a warrantless search and seizure of a car after officers responded to a highway crash involving an intoxicated driver. 413 U.S. at 436, 448. The driver identified himself as a Chicago police officer, causing the responding officers to reasonably believe that he would have a service revolver in his possession. *Id.* at 436. After determining the car posed a "nuisance along the highway," the responding officers had the car towed to a private garage lot seven miles from the police station. *Id.* at 443. The garage lot had no security guard. *Id.* Because the investigating officers had found no service revolver on the driver's person, an officer later looked in the car's trunk for one. *Id.* at 437. Rather than finding a revolver, the officer found evidence linking the driver to a murder. *Id.* The Court upheld the warrantless search, concluding that just because "the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 447–48 (citation omitted). Because the officers believed that the car contained a firearm, the *Cady* Court justified the officers' search based on a "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447.

After *Cady*, courts have justified the seizure of items from inside a car under the community-caretaking doctrine. *See, e.g.*, *Lugo*, 978 F.2d at 636 (concluding that "removal of the gun" was a "community caretaking task" (citing *Cady*, 413 U.S. at 443)). But because public safety lies at the heart of the doctrine, our court has relied

16

on *Cady* to support a warrantless seizure of a firearm and ammunition only when there were concerns about protecting the public. *Id*. In *Lugo*, we upheld a police officer's warrantless removal of those items from a car parked at a service station, concluding that the retrieval of the firearm was a "community caretaking task" necessary "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 633, 636 (quoting *Cady*, 413 U.S. at 443). Similarly, we have concluded that *Cady* justified a warrantless seizure of a weapon from within a car parked at a public lounge after officers arrested a driver and saw a revolver in plain view on the seat and nonmatching ammunition in the passenger compartment. *United States v. Johnson*, 734 F.2d 503, 504–05 (10th Cir. 1984).

Though officers have "some latitude in undertaking their community caretaking role, their actions must be reasonably related in scope to the underlying justification." *Neugin*, 958 F.3d at 931 (internal quotation marks and citations omitted). The government must show that its interest "outweigh[s] the individual's interest in being free from arbitrary governmental interference." *Id.* (alteration in original) (citing *United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005)). This is because "a person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for '[i]t is surely anomalous to say that the individual . . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" *King*, 990 F.2d at 1560 (alterations and ellipsis in original) (citation omitted).

17

We have declined to apply the community-caretaker doctrine absent "specific and articulable facts" concerning a public-safety need. *Neugin*, 958 F.3d at 931 (quoting *Garner*, 416 F.3d at 1213); *see also id.* (concluding that the exception did not apply when an officer opened a car's interior door panel during an inventory search because "the officer testified to no public danger justifying his removal of the panel" (citing *Lugo*, 978 F.2d at 636)).

On appeal, the government seeks to justify the seizure of the firearm under the community-caretaking exception.[7] The government contends that after C.B. denied knowing about or owning the firearm, the deputies could not safely leave the firearm unattended in the car. According to the government, the deputy reasonably retrieved the firearm to protect the public from the firearm's "fall[ing] into untrained or perhaps malicious hands." Appellee's Answer Br. at 34 (quoting *Lugo*, 978 F.2d at 636).

But this broad proposition ignores the narrow circumstances of this case. In our view, the government's approach would extend the community-caretaking doctrine well beyond its present bounds.[8] C.B.'s car was not parked in a public spot

---

[7] The government urged the district court to apply the community-caretaking doctrine to Deputy Chavez's warrantless entry into Mr. Chavez's car to place the car in park. At the suppression hearing, the court agreed with the government on this narrow application.

[8] Absent reliance on Mr. Chavez's un-Mirandized statement admitting his felon status, the government's community-caretaker rationale would lose some force. Had the deputy arrested Mr. Chavez for his traffic violations, he would likely have been home soon, decreasing the risk that the firearm would "fall into untrained or perhaps malicious hands." *Cady*, 413 U.S. at 443.

readily accessible to children, vandals, or thieves. This matters. *See Cady*, 413 U.S. at 446–47 (noting as important that the car "was not parked adjacent to the dwelling place of the owner" "nor simply momentarily unoccupied on a street" (citation omitted)). The Supreme Court has "consistently accorded law enforcement officials greater latitude in exercising their duties in public places," but the same is not said for private, secluded locations. *See Florida v. White*, 526 U.S. 559, 565–66 (1999); *see id.* ("[W]e have drawn upon the established distinction between a warrantless seizure in an open area and such a seizure on private premises." (internal quotation marks and citations omitted)).

Here, the car was lawfully parked at the end of a long, private, dirt road outside an isolated trailer. We cannot ignore the substantial decrease in likelihood that someone would take the firearm in that circumstance as compared to a situation with a more-visible firearm from a car parked on a public street or at a commercial business. *See Miranda v. City of Cornelius*, 429 F.3d 858, 865–66 (9th Cir. 2005) (concluding that police's seizure of a car from a traffic violator's private driveway was unreasonable and outside the community-caretaking function when the location of the vehicle did not "create any need for the police to protect the vehicle or to avoid a hazard to other drivers" (citation omitted)). The government points to no "specific and articulable facts" demonstrating a legitimate concern for public safety based on the location of the car. *Garner*, 416 F.3d at 1213. Common sense tells us that it

19

would take a daring child, vandal, or thief to walk out in the open that distance to a car parked just outside a home to start snooping and burgling. We have found no case applying the community-caretaking doctrine in such a circumstance.

In addition, the deputy could not assume that C.B. would have left the handgun in the car. She might well have taken the firearm into the trailer to prevent the unlikely chance it might fall into "untrained or perhaps malicious hands." *Lugo*, 978 F.2d at 636 (citation omitted). Certainly, as the inhabitant of the trailer, C.B. would have wanted to avoid exposing herself to danger. Yet the deputy never asked C.B. for permission to take the firearm from her car. And though police may "have occasion to take property from a car for safekeeping," the same "does not apply when the owner is present and fully able to take whatever steps he wishes to protect the property in his car." 3 Wayne R. LaFave, *Search and Seizure* § 7.4(b) (6th ed., Sept. 2020 update). We decline to extend the community-caretaker doctrine to these facts.

### E. The Government's Theories for Affirmance Under Which It Must Show Probable Cause of a Crime Involving the Firearm

#### 1. Reliance on Mr. Chavez's un-Mirandized Admission of His Felon Status

The government argues that Mr. Chavez's admission of his felon status established probable cause to seize the firearm. Appellee's Answer Br. at 30. Though this ordinarily would be true, the deputy obtained this admission without furnishing the warning required by *Miranda v. Arizona*, 384 U.S. 436 (1966), so the argument misses the mark. Accordingly, the district court had earlier suppressed Mr. Chavez's statement from use in the government's case in chief. *See Oregon v. Elstad*, 470 U.S.

20

298, 307 (1985) ("[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*."). Later, at the suppression hearing, the district court extended its *Miranda* holding by prohibiting the government from using the statement to show that the deputy had probable cause of a felon-in-possession crime to justify seizing the firearm.

In doing so, the district court relied on *Vogt v. City of Hays*, 844 F.3d 1235 (10th Cir. 2017). We do too. There, we considered whether the Fifth Amendment's self-incrimination protection applies in "a hearing to determine probable cause." *Id.* at 1241. Holding in the affirmative, we noted that the Fifth Amendment protection against self-incrimination "is more than a trial right," and that the Fifth Amendment's reference to a "criminal case" "covers pretrial proceedings as well." *Id.* at 1241–42. In view of this, we can think of no reason why *Vogt*'s ruling would not cover suppression hearings, in addition to preliminary hearings assessing probable cause. From this, we agree with the district court that *Vogt* bars the government from relying on Mr. Chavez's un-Mirandized statement at the suppression hearing—even if the statement were voluntary (but considered coerced for *Miranda* purposes). *See Elstad*, 470 U.S. at 306–07 (noting that because the *Miranda* exclusionary rule "sweeps more broadly than the Fifth Amendment," "patently *voluntary* statements

21

taken in violation of *Miranda* must be excluded from the prosecution's case," (citation omitted)).[9]

### 2.     The Automobile or Plain-View Exception or Both

Even without the un-Mirandized admission, the government contends that the deputy was justified in seizing the firearm under the automobile-exception, the plain-view doctrine, or both. But to justify seizing the firearm under either exception, the government must establish probable cause that Mr. Chavez had committed, or was committing, a crime involving the firearm. *See Texas v. Brown*, 460 U.S. 730, 738 (1983) ("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." (citation omitted)); *United States v. Mercado*, 307 F.3d 1226, 1228 (10th Cir. 2002) ("When federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not

---

[9] The government has not argued under *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion), for admission of the physical fruits of the *Miranda* violation—the firearm—despite suppression of the un-Mirandized statement about his felon status. Addressing the district court's citation to that case, the government contends that the district court mistakenly conflated its argument seeking to admit the statement for purposes of probable cause with a *Patane* argument. We note that the district court's ruling that Mr. Chavez's statement was involuntary would render *Patane* inapplicable anyway. *See Patane*, 542 U.S. at 634 (noting that the physical fruits of a *voluntary* statement may be admitted into evidence). And we note that the district court's involuntariness finding rested in part on the government's advising it that the voluntariness of Mr. Chavez's admission was "a 'tangential issue,'" and on the government's failure to "directly address whether Defendant's statement was voluntary." R. vol. 1 at 389 n.11 (citation omitted).

require them to obtain a warrant prior to searching the car for and seizing the contraband." (citing *White*, 526 U.S. at 563–64)).

Here, as the district court correctly ruled, Mr. Chavez's "simply having a gun in a vehicle does not per se render that gun contraband." R. vol. 1 at 386. The district court noted that New Mexico has some of our country's least-restrictive firearm laws. The state allows for the carrying of loaded firearms—concealed or otherwise—inside an automobile. N.M. Stat. Ann. § 30-7-2(A)(2) (1978).

Though we acknowledge that probable cause "is not a high bar," *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (citation omitted), the government must still present sufficient evidence that "would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place," *United States v. Sparks*, 291 F.3d 683, 687 (10th Cir. 2002) (citation omitted). Here, the government relies on Mr. Chavez's pre-arrest actions.

The government asserts that "a prudent, cautious and trained police officer" would believe based on Mr. Chavez's pre-arrest behavior that the firearm was evidence of an "attempt[] to conceal contraband." Appellee's Answer Br. at 29–30. In particular, the government relies on Deputy Castañeda's testimony describing Mr. Chavez's conduct at the service station: his maintaining a steady gaze, his rolling his shoulder and leaning forward as if to reach something underneath his seat, and his quickly speeding away. The government highlights Deputy Castañeda's concern for

his safety and his belief that Mr. Chavez was concealing contraband as "evidence of criminal conduct," such that he had probable cause to seize the firearm. *Id.* at 30.

We agree with the district court that the deputy lacked probable cause that the firearm was tied to a crime or that the firearm's incriminating nature was "immediately apparent." *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014) (citation omitted). As the district court noted, "[d]efendant's behaviors might be enough to develop reasonable suspicion for a protective pat-down in a *Terry* stop situation or to continue an investigative stop, but they do not cross the threshold into probable cause." R. vol. 1 at 390 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)); *see Wardlow*, 528 U.S. at 121 (finding reasonable suspicion of criminal activity but not probable cause when an individual fled from police officers in an area known for heavy drug trafficking); *Terry,* 392 U.S. at 22–23 (finding reasonable suspicion—but not probable cause—supporting criminal activity when two men were hovering around a street corner, pacing down the same street on the same route, pausing to stare in the window twenty-four times, and meeting with a third man at the end of the street); *United States v. McHugh*, 639 F.3d 1250, 1258 (10th Cir. 2011) ("It is well-settled that nervous, evasive behavior, including fleeing from law enforcement, is a pertinent factor in determining *reasonable suspicion.*" (emphasis added) (internal quotation marks and citations omitted)); *United States v. DeJear*, 552 F.3d 1196, 1198, 1200–01 (10th Cir. 2009) (concluding that a man's nervous behavior established reasonable suspicion to detain him when he kept looking at the officer, he appeared to be trying to conceal something in a car seat by stuffing his

24

hands toward the seat, and he was stopped in a high-crime area). Mr. Chavez's behavior did not establish probable cause connecting the firearm to a crime, nor did the nature of the firearm itself.

Thus, we reject the government's contention that the mere sight of the firearm, combined with everything leading up to finding Mr. Chavez hiding outside his trailer, gave probable cause to seize the firearm—whether under a plain-view or an automobile-exception theory.

## III. CONCLUSION

The government failed to carry its burden in demonstrating that an exception to the warrant requirement applies.[10] Accordingly, we **REVERSE** the district court's denial of the motion to suppress and **REMAND** for further proceedings.

---

[10] On remand, of course, the government may seek to admit testimony about the firearm from the deputies who saw it in plain view, and perhaps even from photographs taken of it. *United States v. Spence*, 721 F.3d 1224, 1230–31 (10th Cir. 2013) (finding that a jury considering a felon-in-possession charge could properly rely on evidence beyond the firearm itself, such as a photograph of the firearm and testimony from an ATF agent).